**Agnes KOEHLER, et al., Plaintiffs,**

**v.**

**Daniel L. PULVERS, et al., Defendants.**

**Civ. No. 82–1076–E.**

United States District Court, S.D. California.

July 9, 1985.

Law Offices of Michael J. Aguirre, and Michael J. Aguirre, Brian D. Miller, and Patricia A. Meyer, San Diego, Cal., for plaintiffs.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, James R. Milliken, Lewis, D'Amato, Brisbois & Bisgaard, Hector E. Salitrero and R. Gaylord Smith, San Diego, Cal., for defendant Jeffrey M. Cheyne.

Rogers & Wells, and Edward I. Silverman, San Diego, Cal., for defendants Daniel L. Pulvers, Common Sense Capital Corp., and Western Investors Network, Inc.

Lawrence J. Borphy, pro se.

ENRIGHT, District Judge.

## BACKGROUND

Plaintiffs filed this action on August 25, 1982, alleging on behalf of themselves and those similarly situated registration violations and misrepresentations in the sale of

securities in the Twenty-One Thirty-One limited partnership ("21–31 Ltd."). The developer defendants formed this partnership to own and develop real property consisting of an office building and adjacent lots situated at 2131 Third Avenue, San Diego, California, including Lots A–D inclusive, of block 246, and Lots H, I, and J of block 247, Horton's Addition.

Three types of security interests were sold: limited partnership interests in 21–31 Ltd., fractionalized trust deed interests in Lots A–D secured by the office building, and fractionalized trust deed interests in Lot J, a parcel adjacent to the office building. On March 29, 1984, this court certified this action for class determination, segregating the injured security holders into two groups, the limited partnership investors and the trust deed investors. Combined, the plaintiff class comprises seventy-three separate claims.

Trial of this action to the court under the Fourth Amended Complaint began on March 21, 1985, and concluded on April 11, 1985. Only five of the fourteen named defendants remained in the case through the conclusion of trial, the others having settled. On April 11, 1985, this court stated for the record its decision, and the essential reasons for that decision. It also indicated that a Memorandum Decision setting forth its findings in greater detail would issue, supplementing and incorporating its oral observations.

Based upon the evidence at trial, the court hereby sets forth its findings and conclusions as follows.

### BASIC FACTS

#### The Developer Defendants

Defendants Common Sense Capital Corporation ("CSCC"), Lawrence J. Brophy, and Daniel L. Pulvers are referred to collectively as the developer defendants.

CSCC was 21–31 Ltd.'s general partner. It also conducted business under the name Creative Financial Planning. Defendants Brophy and Pulvers founded and controlled CSCC. Mr. Pulvers owned approximately 30% of its outstanding shares, and served as a director and as its secretary. Mr. Brophy owned approximately 35% of its shares, and served as a director and as its president.

CSCC was primarily in the business of real estate syndication. It formed and was the general partner of numerous limited partnerships in addition to 21–31 Ltd., including, in order of formation: Creative Financial Planning 78–1 Ltd., Creative Financial Planning 78–2 Ltd., Creative Financial Planning 78–3 Ltd., Creative Financial Planning 78–4 Ltd., Wexford Ltd., Mountain Springs Estate Ltd., Valley Oaks Ltd., Loma Vista Ltd., Indian Rocks Estates Ltd., Mission Industrial Ltd., Sparks B Street Ltd., and 1108 Bluebird Canyon Ltd. CSCC closed its offices in September 1982, and ceased being a California corporation in good standing in 1983.

The developer defendants obtained investment capital from the public by posing as financial planners. CSCC employed a small group of so-called "financial planners" whom it supplied with CSCC office space, and to whom it paid commissions for the sale of investments to "clients." The financial planners typically had a background in either insurance or real estate sales. Both defendants Brophy and Pulvers acted as financial planners in addition to their other duties.

As an alleged financial planning company, CSCC, dba Creative Financial Planners, contacted potential investors by conducting Creative Financial Planning seminars open to the public. Utilizing a slick presentation normally presented by Mr. Brophy, CSCC attempted to lure investment capital out of savings accounts, home equity, insurance policies, and other conservative investment vehicles and into the speculative real estate ventures it controlled. CSCC conducted these seminars on a regular basis at the Rancho Bernardo Inn and the Mission Viejo Country Club. Several of the plaintiffs also attended CSCC sponsored seminars at their mobile home parks.

At the seminars, CSCC offered to draft a "Co-ordinated Financial Plan" for atten-

dees at little or no charge. Individuals who accepted this offer received recommendations to purchase limited partnership or trust deed interests in CSCC controlled partnerships and projects, including 21–31 Ltd.

Defendant Western Investors Network, Inc. ("WIN") is a California corporation formed by defendant Brophy and controlled by CSCC. It officed in the same building as CSCC, acted as its real estate broker, and offered and sold interests in fractionalized notes and trust deeds ("trust deed interests") on CSCC's behalf, including trust deed interests secured by 21–31 Ltd.'s property.

The developer defendants and WIN used instrumentalities of interstate commerce to offer, sell, and deliver the 21–31 Ltd. partnership and trust deed interests. This included soliciting by mail and telephone, mailing purchase confirmation notices, and, in some instances, mailing prospectuses.

### Defendant Cheyne

Defendant Jeffery M. Cheyne, Esquire, a Professional Law Corporation ("Cheyne"), is an attorney licensed to practice in California. He acted as counsel to CSCC from 1978 through 1982. He also acted as counsel to 21–31 Ltd. In this capacity, he served as the legal advisor for the offer and sale of 21–31 Ltd. partnership and trust deed interests.

Prior to the Spring of 1980, and the formation of 21–31 Ltd., Mr. Cheyne provided CSCC with advice, documentation, and other legal services in connection with at least five limited partnerships, including Loma Vista Ltd., Indian Rocks Estates Ltd., Mission Industrial Ltd., and Sparks B Street Ltd. His services included drafting offering documents for each partnership which, as in 21–31 Ltd., issued its securities in alleged private offerings and without registration under federal securities laws or qualification under California's securities laws.

On July 22, 1980, Mr. Cheyne wrote an opinion letter addressed to Financial Planners Equity Corporation to the effect that the 21–31 limited partnership offering was exempt from registration and qualification requirements. Settling defendant Financial Planners Equity Corporation, which served as CSCC's underwriter, had requested an opinion to the offering's status. Mr. Cheyne knew and intended that the letter would be distributed as part of the offering prospectus.

The Letter also stated that the developer defendants were not using seminars or public meetings to sell 21–31 Ltd. partnership interests and that, in effect, each of the offerees had a preexisting relationship with the developer defendants. During the early stages of his representing CSCC, however, Mr. Cheyne attended a CSCC sponsored Creative Financial Planning seminar. He was aware that CSCC's alleged financial planners solicited clients for investment in CSCC controlled limited partnerships and related trust deeds by means of public seminars.

The full extent of Mr. Cheyne's participation in the 21–31 project is described in detail below.

### The Plaintiffs

Most of the plaintiffs are and were unsophisticated investors. Few had a preexisting relationship with the developer defendants at the time they purchased their securities. Named plaintiff Francis J. Jackson dealt with the developer defendants in arms length transactions. He paid valuable consideration equal to his $170,000 21–31 Ltd. partnership interest, and relied in good faith on the developer defendants' purported financial planner status.

Plaintiffs relied upon the misrepresentations discussed in detail below. This reliance was reasonable in part because of the developer defendants' purported disinterested financial planner status. The court further finds that the plaintiffs could not have discovered their claims until approximately August 1982.

### "21–31" Project and Offerings

21–31 Ltd.'s objective was to acquire, refurbish, and sell at an appreciated value

within three years the office building at 2131 Third Avenue ("Lots A–D"). CSCC failed to disclose to most investors its prior ownership of this property. In June 1979, CSCC purchased Lots A–D for $685,000, selling it four months later for $895,000 to a group which double escrowed and immediately conveyed the same to Alfred Salgonick and Jerome Hoffman.

On March 20, 1980, the developer defendants opened escrow to repurchase Lots A–D for 21–31 Ltd.'s account. This time they agreed to pay $1,200,000, nearly double the amount CSCC had paid seven months earlier when purchasing for its own account. The developer defendants placed none of their own money at risk.

As originally planned, a joint venturer was to provide 21–31 Ltd. with the $500,000 required for down payment. When the joint venturer's financing failed to materialize, CSCC renegotiated the terms of purchase and escrow. Escrow was extended to August 21, 1980, the sellers doubled their purchase money trust deed to $595,-000, and the down payment was reduced from $500,000 to $300,000.

With escrow still open, and without title to the property, CSCC caused 21–31 Ltd. to offer and sell between April 1980 and July 1980 approximately $321,000 in Lots A–D fractionalized trust deed interests. In December 1980, additional trust deed interests totaling approximately $35,000 also issued on this same property. These latter funds came from pension plans administered by settling defendant ADP Pension Services, Inc.

CSCC and the developer defendants utilized the purported financial advisor scheme previously described to offer and sell the Lots A–D trust deed interests. Offerees were provided with a trust deed loan proposal, which, together with oral representations, made the trust deed interests appear attractive and secure. The developer defendants represented that the trust deed proceeds would be used solely to refurbish the office building at 2131 Third Avenue; that the $350,000 borrowed from trust deed investors was secured by $880,-000 in equity; that monthly interest would be at 18% per annum with the notes maturing in three years; and that a 3% bonus would be paid if principal were not returned before the three years expired. Investors were also told that there would be a seller financed subordinated trust deed not exceeding $280,000.

Immediately thereafter, specifically from August 1980 through December 1980, the developer defendants sold the 21–31 Ltd. partnership interests, again utilizing the financial planning seminars and taking advantage of their alleged disinterested financial planner status. The developer defendants promoted these interests with written and oral representations to the effect that the office building and land would be worth $3,500,000 at the project's conclusion; that the investors could expect up to a 148% return over three years; that 21–31 Ltd. had $350,000 in construction loan commitments; and that the limited partnerships were exempt from registration under federal securities laws and from qualification requirements under California law.

Contrary to the impression created by the developer defendants, CSCC's business and financial condition prior to and during 21–31 Ltd.'s partnership and trust deed sales was poor. Through written and oral misrepresentations, half-truths and omissions, the developer defendants misled 21–31 Ltd. investors into believing that the other partnerships it managed were prospering. They actively concealed that at least two of the projects described in the 21–31 Ltd. offering prospectus were experiencing serious financial and/or developmental difficulty, and had failed to generate projected revenues.

Throughout its existence, CSCC paid its daily operating expenses, salaries, and commissions with advanced and diverted investment capital. Prior to and during the 21–31 Ltd. offerings, hundreds of thousands of dollars were shuffled among CSCC's various partnerships in undocumented transactions intended to keep projects afloat, to maintain the appearance of projected cash flow, and to benefit CSCC

principals personally. For example, on September 19, 1980, defendant Brophy used $90,000 of Mission Industrial Ltd. funds to purchase for himself a house built by Creative Financial Planning 78–2, Ltd.

The developer defendants treated the 21–31 Ltd. partnership and trust deed offerings as a single plan of financing the 2131 Third Avenue development. The Lots A–D investors were told, however, that their funds would be used exclusively to refurbish the project's office building. Instead, on August 21, 1980, CSCC, acting by agreement among its officers, including defendants Brophy and Pulvers, used the majority of the trust deed proceeds as partial down payment to acquire the property it had issued the trust deeds on, rather than to refurbish that property's improvements. Evidence supports the inference that defendants Brophy and Pulvers never intended to use the Lots A–D trust deed proceeds for refurbishment. Trust deed proceeds not spent purchasing Lots A–D were expended on CSCC's other partnership and business interests. For example, by September 16, 1980, the CSCC controlled partnership Mission Industrial owed 21–31 Ltd. approximately $50,000.

With the money intended for refurbishment diverted to other uses, CSCC left the office building gutted and vacant. It remained unoccupied until the project collapsed. The building's unfinished condition and the lack of refurbishment funds were the primary reasons for 21–31 Ltd.'s failure.

To summarize, the developer defendants used their purported financial advisor status as a deceptive device to prospect for and specifically channel investors' savings into 21–31 Ltd., as well as other CSCC controlled partnerships and projects. In connection with 21–31 Ltd., they facilitated this practice with written and oral misrepresentations, half-truths, and omissions. Failures to disclose included that trust deed money would not be used to refurbish the 2131 Third Avenue improvement, that the property was encumbered with greater debt than represented, that CSCC had suf-

fered financial losses and was operating on advanced and diverted investment capital, that CSCC was and had been commingling funds among its controlled partnerships, that few if any CSCC projects had or were expected to meet projected cash flow or returns, and that the $3.5 million projected sales price was exaggerated and without substantial basis in fact.

As attorney for CSCC and 21–31 Ltd., Mr. Cheyne's knowledge of and participation in the 21–31 Ltd. development was extensive. He advised the developer defendants on the manner of selling the partnership and trust deed interests, and represented CSCC in the purchase of Lots A–D, and in separate transactions, Lots H, I, and J. When the intended joint venturer failed to produce the $500,000 down payment for Lots A–D, Mr. Cheyne advised CSCC's renegotiating the purchase. After the sellers reduced the down payment and doubled the purchase money trust deed to $580,000, Mr. Cheyne drafted the agreement subordinating the sellers' trust deed to the fractionalized trust deed, knowing that 21–31 Ltd. offerees were being told both that the subordinated encumbrance was limited to $280,000, and that the project was backed by $880,000 in equity. The resulting increased debt load increased the investors' risk and rendered equity and projected cash flow representations unrealistic and without basis in fact.

From his earlier work on the 21–31 Ltd. private placement memorandum, Mr. Cheyne knew that the Lots A–D investors were being told their monies would be used to refurbish the office building, and that the limited partnership proceeds would not be available to close escrow on Lots A–D.

He also knew that CSCC did not have sufficient cash of its own to fund the $300,000 down payment. Documents from Mr. Cheyne's files during the relevant period indicate that CSCC had, at most, $103,000.

The evidence supports the inference that Mr. Cheyne should have known that CSCC could not timely close escrow on 21–31 Ltd.'s behalf without diverting and misapplying trust deed funds purportedly raised

for refurbishment. Additionally, before completing the 21–31 Ltd. offering materials,[1] Mr. Cheyne should have known, if he did not already know, that prior CSCC projects were failing or, at best, unsuccessful, that CSCC seminars were being used as a prospecting device for CSCC ventures, and that 21–31 Ltd.'s projected resale price of $3.5 million was, at best, unrealistic given CSCC's track record.

In contrast to the true state of affairs, the 21–31 Ltd. private placement documents Mr. Cheyne prepared created the impression that CSCC's other projects were successful, that no use was being made of public seminars, and that offerees had a preexisting relationship with CSCC. Mr. Cheyne knew or should have known that the financial planning scheme was a facade. Moreover, the offering documents projected investor cash flow savings which were internally inconsistent with investor suitability requirements; the former assumed a 50% tax bracket, while the latter permitted investors in the 35% tax bracket.

During the relevant selling periods Mr. Cheyne entertained serious and legitimate concerns that 21–31 Ltd.'s trust deed and partnership sales constituted an integrated securities offering not in compliance with private placement requirements. He failed to disclose these concerns, however, in either his opinion letter to the underwriter or the private placement memorandum. Both documents opined to the limited partnership's exempt registration and qualification status. Mr. Cheyne also should have known that CSCC sold 21–31 Ltd. partnership interests to non-California residents; he advised to the propriety of offering the same to United States trust territory residents.

By mid 1981, 21–31 Ltd. faced imminent bankruptcy, and CSCC attempted to raise additional capital by causing 21–31 Ltd. to issue fractionalized trust deed interests on Lots I and J. Those interests were offered from June 1981 through October 1981 on parcels adjacent to Lots A–D. 21–31 Ltd. had previously acquired Lots I and J to provide parking for its office building.

Mr. Cheyne advised the developer defendants of his concern that these interests might properly be securities under California law, and subject to integration with the limited partnership and prior trust deed offerings. He recommended, however, that if the appearance of integration could be avoided, the trust deeds could issue without significant legal exposure. Pursuant to this advice, the developer defendants marketed the trust deed interests through a separately controlled entity, defendant WIN, a real estate brokerage firm.

The developer defendants used the same financial planning scheme previously described to locate investors and sell the Lot I/J interests. Investors were told that their interests would be recorded, that the money raised would be used to improve Lot I with a parking lot, that 21–31 Ltd.'s cash flow was sufficient to pay 20% per annum interest, and that principal plus three points would be returned within two years.

By letter dated July 23, 1981, Mr. Cheyne advised the developer defendants that their diversion of investor funds was a criminal offense creating securities and other legal problems. There was conflicting evidence as to when Mr. Cheyne first learned of funds being diverted, misapplied, and commingled. Some evidence suggests that he knew as early as September 1980, if not before. Mr. Cheyne testified that he learned of the problem only days before writing the July 23, 1981 letter.

The court's findings from the bench addressed Mr. Cheyne's less than candid trial testimony. It is the court's settled belief that he knew of commingling among partnerships many months before his July 1981

---

1. Mr. Cheyne prepared the following offering documents for distribution to 21–31 Ltd. partnership offerees: the 21–31 Ltd. Confidential Private Placement Memorandum; the First Amendment to the 21–31 Confidential Private Placement Memorandum; the Subscription Agreement; the Pre-offering Questionnaire; Prospective Offeree Analysis Sheet; the opinion letter; the 21–31 Ltd. Partnership Agreement; and the First Amendment to the Limited Partnership Agreement.

letter—a document apparently prepared for posterity. It is instructive that Mr. Cheyne did not follow up on the letter, or otherwise investigate to ensure that corrective measures were initiated.

On October 27, 1981, CSCC rerecorded the Lot I/J fractionalized trust deed on Lot J. It had previously been recorded on Lot I. That same day, CSCC, acting through Mr. Pulvers, issued a $2,700 check to a local bankruptcy attorney, using Lot I/J proceeds. On November 3, 1981, CSCC, acting on Mr. Cheyne's advice, filed 21–31 Ltd.'s petition for bankruptcy reorganization, and by December 1981, all interest payments on 21–31 Ltd. fractionalized trust deeds had stopped.

Through a series of letters and meetings between November 1981 and August 1982, CSCC, acting primarily through Mr. Pulvers, informed 21–31 Ltd. investors that their investments were safe, and that the development's problems were caused by a downturn in the economy.[2] During this period, CSCC also assessed limited partners additional cash contributions. Many investors continued making payments until CSCC closed its doors in September 1982. Additional contributions collected totaled $8,640.

Shortly after this action's August 25, 1982 filing, the reorganization converted to a Chapter VII liquidation. 21–31 Ltd.'s real estate sold in bankruptcy for $700,000. This is $500,000 less than 21–31 Ltd. had paid for the property, and $2.8 million less than CSCC had represented it would be worth. None of the bankruptcy proceeds returned to the 21–31 Ltd. trust deed or partnership investors.

## LIABILITY

### Preliminary Conclusions of Law

Before addressing separate theories of liability, some preliminary findings and conclusions are set forth.

2. Mr. Brophy had previously relocated to Las Vegas, Nevada, although he retained his ownership interest in CSCC and WIN throughout the relevant period, and did not tender his resigna-

■ Both the 21–31 Ltd. limited partnership and fractionalized trust deed interests secured by Lots A–D and J are investment contracts and securities under federal and state law. 15 U.S.C. § 77b(1); 15 U.S.C. § 78c(a)(10); *S.E.C. v. W.J. Howey, Co.*, 328 U.S. 293, 298–01, 66 S.Ct. 1100, 1102–04, 90 L.Ed. 1244 (1946); *S.E.C. v. Murphy*, 626 F.2d 633, 641–42 (9th Cir.1980); *United States v. Farris*, 614 F.2d 634, 640–42 (9th Cir.1979), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 420 (1980); *People v. Schock*, 152 Cal.App.3d 379, 199 Cal.Rptr. 327 (1984). In regard to the fractionalized trust deed interests, the note holders placed substantial trust in the management skill and solvency of the developer defendants and in the success of the 21–31 Ltd. project. Ordinary individual investors, including widows and the elderly, committed relatively modest sums to the common development of 2131 Third Avenue, and reasonably expected to derive returns from the developer defendants' entrepreneurial and managerial efforts. The trust deed interests, accordingly, carry the indicia of investment contracts.

Neither the developer defendants nor WIN registered the limited partnership or trust deed interests (herein "21–31 securities") pursuant to § 5 of the Securities Act of 1933 (15 U.S.C. § 77e). Similarly, they did not qualify them with the California Corporation's Commission (Cal.Corp.Code § 25110). At trial, defendants did not contest this issue.

■ Additionally, the offer and sale of Lots A–D and J trust deed interests and 21–31 partnership interests are properly considered a single integrated securities offering. The Ninth Circuit in *S.E.C. v. Murphy* sets forth the factors which guide integration evaluation:

The factors are: (a) whether the offerings are part of a single plan of financing; (b) whether the offerings involve issuance of the same class of securities;

tion as an officer and director of CSCC and WIN until July 21, 1981, and August 5, 1981, respectively.

(c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received; and (e) whether the offerings are made for the same general purpose. *S.E.C. v. Murphy, supra*, 626 F.2d at 645. These considerations largely favor an integrated offering. All of the securities except the Lot J trust deed interests sold between April and December 1980. The securities issued for the same represented purpose, the development of 2131 Third Avenue, and the proceeds were expended in the same manner: indiscriminately on either 2131 Third Avenue or CSCC's other ventures, whichever appeared expedient. In either case, the 21–31 limited partnership and trust deed sales represented a single plan for financing CSCC's business ventures, principally the development of 2131 Third Avenue.

Finally, defendants and each of them have failed to show that plaintiffs' claims are subject to the equitable defenses in *in pari delicto* (*Lawler v. Gilliam*, 569 F.2d 1283 (4th Cir.1978)), estoppel (*Hecht v. Harris, Upham & Co.*, 430 F.2d 1202 (9th Cir.1970)), laches (*Mihara v. Dean Witter & Co.*, 619 F.2d 814 (9th Cir.1980)), or waiver (*Meyers v. C. & M. Petroleum Producers, Inc.*, 476 F.2d 427 (5th Cir.1973)).

*Section 12(1), Securities Act of 1933*

Section 12(1) of the 1933 Act (15 U.S.C. § 77*l* (1)) creates a private right of action for violation of § 5 of the 1933 Act (15 U.S.C. § 77e). Section 13 of the 1933 Act (15 U.S.C. § 77m) provides a one year statute of limitations for § 12(1) claims. Section 13's proper application in this action was previously considered [*see* Memorandum Decisions herein dated March 29, 1984, October 5, 1984, and January 30, 1985, 606 F.Supp. 164]. It was determined that the one year statute of limitations is absolute, and not subject to equitable tolling. This conclusion stands reaffirmed.

It was also previously determined that this action, filed August 25, 1982, is untimely under § 12(1) of the 1933 Act as to all plaintiffs except the Lot J investors.

The evidence at trial confirmed this. All securities at issue, except the Lot J trust deeds, were sold prior to August 25, 1981. In contrast, the Lot J securities were sold during October 1981, clearly within the one year limitations period. Accordingly, only Lot J investors went to trial on § 12(1) claims.

Section 5 of the 1933 Act forbids the offer or sale by any person of unregistered securities in interstate commerce, but does not apply if the securities are exempt from registration as a private offering (§ 4(2), 15 U.S.C. § 77d(2)), or are not offered or sold in a transaction by an issuer, underwriter, or dealer (§ 4(1), 15 U.S.C. § 77d(1)). *S.E.C. v. Murphy, supra*, 626 F.2d at 640. Liability for violation of § 5, however, is not limited to persons who pass title. Rather, "courts have established the concept of participant liability to bring within § 5 persons other than direct sellers who are responsible for the distribution of unregistered securities." *Id.* at 649.

While participant liability has been likened to aider and abettor liability (*Admiralty Fund v. Jones*, 677 F.2d 1289, 1295 n. 4 (9th Cir.1982)), it employs a proximate cause test. *S.E.C. v. Murphy, supra*, 626 F.2d at 650. "[A] defendant will be held liable as a participant under § 12 if his acts were both necessary to and a substantial factor in the sales transaction." *Id.* And, unlike secondary or aider and abettor liability, participant liability is primary, and does not entail a specific showing of scienter. *Compare S.E.C. v. Murphy, supra*, with *Harmsen v. Smith*, 693 F.2d 932, 944 (9th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) ("secondary violator's duty arises from 'knowing assistance of or participation in a fraudulent scheme.' (citation)").

As indicated above, the 21–31 securities were unregistered and offered and sold in interstate commerce. For purposes of registration analysis, those securities also issued in the context of an issuer transaction, with CSCC regarded as the issuer (*see S.E.C. v. Murphy, supra*, 626 F.2d at 642–

44 (general partner of limited partnership treated as issuer for registration exemption); *accord Doran v. Petroleum Management Corp.*, 545 F.2d 893, 897–99, 901–04 (5th Cir.1977)). They accordingly issued in violation of § 5 unless exempt as a private offering.

■ The defendant has the burden of proving as an affirmative defense an offering's exempt status from registration, as well as qualification, requirements. *S.E.C. v. Murphy, supra*, 626 F.2d at 641; *Doran v. Petroleum Management Corp., supra*, 545 F.2d at 899; *People v. Park*, 87 Cal. App.3d 550, 566, 151 Cal.Rptr. 146 (1978). None of the defendants herein carried this burden.

■ The following considerations determine the availability of a private offering exemption: 1) the number of offerees; 2) the offeree's sophistication; 3) the size and manner of the offering; 4) and, the issuer's relationship to the offerees. *S.E.C. v. Murphy, supra*, 626 F.2d at 644–45; *Doran v. Petroleum Management Corp., supra*, 545 F.2d at 902. These considerations are addressed seriatim.

The developer defendants' use of the purported financial planning seminars to promote the 21–31 securities renders it virtually impossible to know the precise number of persons contacted on any of the several offerings. The fact that CSCC conducted these public seminars on an ongoing basis in order to "prospect" for investors, however, strongly suggests a public rather than private offering.

The investors' general lack of sophistication has already been addressed. The court at this juncture adds only that most plaintiffs relied on the developer defendants' alleged disinterested financial planner status to overcome their lack of sophistication, and that the developer defendants took advantage of this reliance for personal gain.

"If an offering is small and made directly to the offerees 'rather than through the facilities of public distribution such as … the securities exchange,' a court is more likely to find that it is private. (citation)". *S.E.C. v. Murphy, supra*, 626 F.2d at 646. The integrated 21–31 securities offering comprised approximately $1.1 million in sales. While this may appear comparatively small, its amount is not insignificant. Moreover, "absent a significant showing that the investors did not need the protection of the Act" (*Id.* at 646–47, citing *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953)), this court is not inclined to consider the offering private or nonpublic.

■ The 1933 Act protects investors primarily by providing access to extensive information about the issuer and offering. Purchasers of unregistered securities must be shown to have been in a position to acquire similar information about the issuer before an offering can be regarded as nonpublic and exempt. *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 678 (4th Cir.), *cert. denied*, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967); *S.E.C. v. Murphy, supra*, 626 F.2d at 647. At a minimum, this includes accurate information on the use of investor funds, the benefits to be derived by the issuer, and relevant financial statements. *S.E.C. v. Murphy, supra*, 626 F.2d at 647.

■ As discussed above, CSCC omitted or mispresented material information of substantial importance, including the use of investor funds, its non-ownership of the property, its true track record, its inadequate liquidity and precarious financial condition, the commingling and diversion of funds, its unrealistic projected returns, the true risk and character of the 21–31 securities, and the true nature and purpose of the purported financial planner relationships. Accordingly, the developer defendants did not provide investors with access to information required under the Act. The integrated offering fails to qualify as a nonpublic private offering under both federal and California securities laws. *S.E.C. v. Ralston Purina Co., supra*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494; *S.E.C. v. Murphy, supra*, 626 F.2d 633; *Doran v. Petroleum Management Corp., supra*, 545 F.2d

893; *People v. Park, supra,* 87 Cal.App.3d 550, 151 Cal.Rptr. 146.[3]

Absent an exempt transaction,[4] the 21–31 securities issued in violation of § 5 of the 1933 Act. Because each of the developer defendants and WIN directly sold 21–31 securities, each is primarily liable as sellers under § 12(1) of the 1933 Act. Those same defendants are alternatively liable as participants in the sale of 21–31 securities. The evidence indicates that each was a substantial factor in the sales transactions and proximately cause the investors' injuries, including those of the Lot J investors. *Admiralty Fund v. Jones, supra,* 677 F.2d at 1294 (9th Cir.1982); *S.E.C. v. Murphy, supra,* 626 F.2d at 648–52.

■ Finally, a person may be liable under each of the federal securities liability sections if he controlled violating conduct. "A controlling person is liable ... [if he] 'acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause of action' (citation)...." *Burgess v. Premier Corp.,* 727 F.2d 826, 832 (9th Cir.1984). The controlling person must also have "participated" in the offending deeds. *Id.*

■ Defendants Brophy and Pulvers by their influence, directorships, offices, and/or majority stock ownership, controlled the actions of CSCC which, in turn, caused 21–31 Ltd. to enter into a loan-brokerage agreement with WIN and offer Lot J interests. Whether CSCC or 21–31 Ltd. is properly viewed as the issuer of the trust

deed interests, defendants Pulvers and Brophy induced, directly or indirectly, the conduct constituting the registration violation. The court makes this finding as to Mr. Brophy despite the fact that he was physically absent from California at the time of, and immediately prior to, the Lot J offering.

■ As to Mr. Cheyne, the evidence compels the conclusion that he too is liable under § 12(1) as a participant. In connection with the sale of Lot J interests, Mr. Cheyne harbored substantial concern about the trust deeds' nonexempt status, but nevertheless sold the services of his good office which made the offering possible. He was the principal architect of the CSCC/WIN loan brokerage agreement designed to avoid detection of the integrated offering and minimize exposure for the suspected unlawful sale of unregistered securities. He prepared the loan brokerage agreement, the Lot I/J fractionalized trust deeds, and the notes secured by the trust deeds. The court finds that another attorney acting responsibly would not, with Mr. Cheyne's knowledge and imputed knowledge (previously discussed), have assisted CSCC in causing 21–31 Ltd. to offer the Lot J securities as he did. Mr. Cheyne's actions accordingly were a direct, substantial, and proximate cause of the injury inflicted on the Lot J investors. *Admiralty Fund v. Jones, supra,* 677 F.2d at 1294–95; *Felts v. National Account Systems Ass'n, Inc.,* 469 F.Supp. 54, 68 (N.D.Miss.1978).

3. At trial, defendants also attempted to rely on the private offering exemption as elaborated by Rule 146, 17 C.F.R. § 230.146. Rule 146 requires that issuers have "reasonable grounds to believe" that offerees and purchasers either are capable of evaluating the investment, or have a competent advisor who is, and are able to bear the financial risk. Rule 146(d)(1), (2). Moreover, Rule 146 requires that each offeree have access to the kind of information disclosed by registration. Rule 146(e)(1). The discussion above resolves this latter consideration against defendants. As to the former, CSCC, dba Creative Financial Planning, posed as the offerees' disinterested financial advisors to exploit their investment naivete. Defendants accordingly lacked a reasonable basis for believing that the offerees had either competent advisors or sufficient independent expertise to evaluate the interests CSCC offered.

4. The issue arose at trial to whether the developer defendants could rely upon the intrastate exemption under § 3(a)(11) of the 1933 Act, and, more specifically, under Rule 147's "safe harbor." An issuer may not rely on the intrastate exemption of § 3(a)(11) unless every offeree and purchaser is a resident of the issuer's state. 17 C.F.R. § 230.147. Here, that would be California. Because the evidence reflects a 21–31 Subscription Agreement and Pre-Offering Questionnaire indicating that at least two investors were not California residents at the time of purchase, the intrastate exemption is unavailable.

Without his affirmative assistance, the offering would not have been accomplished.

### Section 25110, California Corporations Code

The 21–31 integrated securities offering issued without permit or qualification in a nonexempt transaction and in violation of California Corporations Code § 25110. That section proscribes the offer or sale of nonexempt securities in California unless qualified with the Commissioner of Corporations.

California Corporations Code § 25503 creates a cause of action in rescission for violation of § 25110. On prior occasion this court found the applicable two year statute of limitations (§ 25507, Cal.Corp. Code) to be absolute, and not subject to tolling by proof of fraudulent concealment. [*See* Memorandum Decisions herein dated January 30, 1985, and October 5, 1981]. It was also determined that the purchase date is the event from which the limitations period properly runs. [*See* Memorandum Decision herein dated January 30, 1985]. Because this action was filed on August 25, 1982, the § 25503 claims of all plaintiffs purchasing prior to August 25, 1980 are time barred. This precludes only the Lots A–D trust deed investors and a small number of limited partners.

■ Section 25503 imposes liability against the issuer. As indicated, CSCC should be regarded as the issuer for the limited partnership interests, and it is accordingly liable for § 25110's violation. Logic suggests it should also be regarded as the issuer of the trust deed interests. CSCC is, accordingly, liable under § 25503 for those sales as well.

■ To the extent that CSCC might not properly be viewed as the issuer, however, it is liable for the qualification violation under California Corporations Code § 25504, together with defendants Brophy, Pulvers, and WIN. That section imposes liability against controlling persons, and specified others (including broker-dealers), who materially aid a § 25110 violation.

The developer defendants and WIN additionally possessed the requisite scienter such that they are liable for aiding and abetting the § 25110 violation (Cal.Corp. Code § 25504.1).[5]

■ Liability for the qualification violation, however, does not extend to Mr. Cheyne. Aider and abettor liability under § 25504.1 requires material assistance of the violation "with intent to deceive or defraud." Plaintiffs failed to prove requisite scienter as to Mr. Cheyne.[6] Similarly, Mr. Cheyne does not fall within the umbra of § 25504. That section's standard of care extends to partners, officers, directors, employees, broker-dealers, or agents of an entity issuing nonexempt unqualified securities. As CSCC's attorney, Mr. Cheyne does not fit within the plain meaning of the listed categories.

### Section 12(2), Securities Act of 1933; Sections 25401, 25501, California Corporations Code

Section 12(2) of the Securities Act of 1933 creates an action in rescission for the use of the mails or facilities of interstate commerce to offer or sell securities by use of written or oral untrue or misleading statements, or omissions.

This decision already recites numerous facts about the 21–31 development and its developers which defendants misrepresented or failed to reveal to the investors. There is no doubt that a reasonable investor would consider this omitted information important in making an investment decision. "Surely the materiality of information relating to financial condition, solvency, and profitability is not subject to serious challenge." *S.E.C. v. Murphy, supra,* 626 F.2d at 653. The same necessarily appears true of information relating to use of investor funds, ownership of the property, projected returns, interpartnership borrowing, and the true motive and nature of

---

**5.** See discussion *infra.*

**6.** See discussion *infra.*

the purported financial planner relationships.

At trial, no defendant demonstrated "that he did not know, and in the exercise of reasonable care could not have known" of the untruths or omissions (15 U.S.C. § 77*l*(2)), and the following conclusions follow.

■ Defendant CSCC offered and sold the 21–31 securities using facilities of interstate commerce by means of written and oral misleading statements and material omissions in violation of § 12(2) of the 1933 Act, and the California equivalent, §§ 25401, 25501 (Cal.Corp.Code). Defendants Brophy, Pulvers, and WIN are equally liable under § 12(2) for having made direct sales. These latter defendants are also liable as participants in the 21–31 securities sales (*Admiralty Fund v. Jones, supra,* 677 F.2d at 1294), as is CSCC in those instances where it might not properly be viewed as the issuer. Defendants Brophy and Pulvers are additionally liable as control persons of CSCC and, together with CSCC, of 21–31 Ltd. to the extent the latter might be considered the issuer of the trust deed interests (15 U.S.C. § 77*o*; *Felts v. National Account Systems Ass'n, Inc., supra,* 469 F.Supp. at 66).

As to the developer defendants and WIN, the same grounds for liability above also support liability under California's equivalent and related provisions (Cal.Corp.Code §§ 25401, 25501, and 25504). Those defendants additionally possessed the requisite scienter for aider and abettor liability under Cal.Corp.Code § 25504.1. Their culpable conduct was knowing and with intent to defraud.

Mr. Cheyne's participant liability addressed in terms of § 12(1) above extends to the integrated 21–31 securities offering under § 12(2). His years of servicing CSCC placed at his disposal information which should have placed a prudent attorney on notice of the serious securities, financial, and developmental problems associated with CSCC, generally, and 21–31 Ltd. in particular. With this knowledge, Mr. Cheyne should have known of the misrepresentations, half-truths, and omissions disseminated through the offering materials he prepared, and by the oral sales presentations facilitated by the purported disinterested financial planner relationships whose true and deceptive nature Mr. Cheyne apparently failed to grasp. Mr. Cheyne nevertheless advised that the 21–31 securities issue as an alleged exempt transaction, provided the necessary opinions to that effect, and permitted those opinions to be disseminated to the underwriter and investors. He structured transactions to avoid detection of the securities violations, and never independently investigated information supplied by the developer defendants for incorporation into the offering materials he prepared. "The duty of the lawyer includes the obligation to exercise due diligence including a reasonable inquiry, in connection with responsibilities he has voluntarily undertaken. A lawyer has no privilege to assist the issuer circulate statements which he knows or should know to be false...." *Felts v. National Account Systems Ass'n, Inc., supra,* 469 F.Supp. at 67; *accord, S.E.C. v. Frank,* 388 F.2d 486, 489 (2d Cir.1968).

■ In short, because Mr. Cheyne lent his name and provided necessary and substantial services to promote and facilitate the sale of securities which he should have known issued in violation of registration and disclosure requirements, he proximately caused the investors' injuries. Section 12(2) participant liability is warranted against all defendants as to all plaintiffs.

Liability does not automatically follow as to Mr. Cheyne, however, under California's corresponding and related securities provisions. Section 25501 (Cal.Corp.Code) is made applicable to certain collateral persons by §§ 25504, 25504.1, and 25504.2. Mr. Cheyne does not fit within the categories of persons specified by § 25504, and he lacks the requisite scienter for aider and abettor liability under § 25504.1.

Plaintiffs and the Commissioner of Corporations (appearing specially) urge that Mr. Cheyne is culpable under § 25504.2.

While this matter is not free from doubt, the court agrees.

 Section 25504.2 imposes a standard of care upon experts who supply material for, and consent to be named (and are named) in an offering prospectus.[7] This standard of care extends to attorneys (1 Marsh & Volk, *Prac. Under Cal. Securities Law*, § 14.03[4A][b][iii-v] (1984)), and breach renders an attorney (or other expert) jointly and severally liable for violation of § 25501 (misstatements or omissions in the sale of securities).

 In addition to imposing a standard of care, however, the statute limits potential exposure to the expert who "pursuant to rule of the commissioner [of Corporations] has given written consent to be and has been named in any prospectus." Cal. Corp.Code, subsection 25504.2(a). The Commissioner's Rules require that such written consent be filed for any prospectus containing expertised material where the underlying offering is subject to qualification (1 Marsh & Volk, *supra, Cal. Securities Law*, § 14.03[4A][b][iii] n. 26).

With Mr. Cheyne's consent, his written opinion to the 21–31 limited partnership interests' exempt status accompanied the private placement memorandum, and his name appeared in the offering prospectus, again, with his consent. No "written consent" was filed with the Commissioner of Corporations, however, precisely because Mr. Cheyne advised that the offering should issue without qualification in an alleged exempt private placement. The Commissioner's Rules only require the filing of written consent for use of expertised material where the offering is subject to qualification (1 Marsh & Volk, *supra, Cal. Securities Law*, § 14.03[4A][b][iii]).

Mr. Cheyne contends that because no written consent was filed, and because § 25504.2 limits exposure to instances where written consent is filed "pursuant to rule of the commissioner," he is not liable under that section. His reasoning, however, advances a conclusion which the statute's drafters did not likely intend. If it were followed, an attorney would never be liable under § 25504.2 where he negligently determined that a written consent need not be filed because he wrongly advised that an offering is exempt. This would preclude attorney liability where the public is most in need of protection.

 As this court reads § 25504.2, a "written consent" (defined only as such consent as is required under the Commissioner's Rules (Cal.Admin.Code § 260.504.-

7. Section 25504.2 states:

(a) Any ... person whose profession gives authority to a statement made by such person, who pursuant to rule of the commissioner has given written consent to be and has been named in any prospectus or offering circular distributed in connection with the offer or sale of securities as having prepared or certified in such capacity either any part of such document or any written report or valuation which is distributed with or referred to in any such document is jointly and severally liable with any other person liable under Section 25501 if:

(1) The part of such document so prepared or certified or the report or valuation so distributed or referred to includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(2) The person asserting such liability acquired a security described in such document in reliance on such untrue statement or in reliance on such part of the document or on such report or valuation without notice of such omission.

(b) Notwithstanding the provisions of subdivision (a), no such ... person shall be liable as provided therein if such person sustains the burden of proof that

(1) Such person had, after reasonable investigation, reasonable ground to believe and did believe, *at the time such person consented to such use of such person's name,* that the statements so included in such part of such document or in such report or valuation were true and that there was no omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading;....

(c) *A person who participates in the preparation of a document described in subdivision (a) of this section shall be deemed to have prepared or certified only those portions thereof which are expressly stated with such person's written consent to have been made on such person's authority.*

2.1(d); 1 Marsh & Volk, *supra, Cal. Securities Law,* § 14.03[4A][a] n. 10) ), which should have been filed but was not (as in the case here), must be deemed filed where the use of the expert's material was in fact consensual and precluded filing. Accordingly, because Mr. Cheyne in fact consented to the use of his name and opinion in the limited partnership offering materials, and because, under the circumstances, that consent is deemed written and filed in compliance with the Commissioner's Rules, Mr. Cheyne is properly liable for § 25504.2's violation, if the statute's other elements are satisfied. In this regard it is apparent that Mr. Cheyne's opinion was misleading. The evidence is also adequate to conclude that it was both given without reasonable basis for believing its truth, and acted upon by investors. Mr. Cheyne is accordingly liable to the 21–31 Ltd. limited partners for misstatements in the sale of securities under California law (§§ 25401, 25501, 25504.-2, Cal.Corp.Code).

*Section 10(b), Securities & Exchange Act of 1934; S.E.C. Rule 10b–5; Section 17(a), Securities Act of 1933; Fraud and Deceit, Cal.Civ.Code §§ 1709, 1710*

The numerous significant and material facts about the 2131 Third Avenue development, its developers, and the 21–31 securities which the defendants misrepresented or failed to reveal are recounted above. The conclusions below supplement those findings relative to plaintiffs' claims based upon allegations of fraud.

This action proceeded to trial under, *inter alia,* § 10(b), Securities & Exchange Act of 1934 (15 U.S.C. § 78j(b) ),[8] S.E.C. Rule 10b–5 thereunder (17 C.F.R. 240.10b–5),[9] § 17(a), Securities Act of 1933 (15 U.S.C. § 77q(a) ),[10] and on the pendent claim of fraud and deceit (Cal.Civ.Code §§ 1709, 1710).

The developer defendants and WIN possessed the requisite scienter for their culpable conduct. *Aaron v. S.E.C.,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980); *Burgess v. Premier Corp., supra,* 727 F.2d at 832 (9th Cir.1984); *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz,* 57 Cal.App.3d 104, 109, 128 Cal.Rptr. 901 (1976); *cf. Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir. 1981) (actions under § 17(a) of the 1933 Act and § 10(b) of the 1934 Act are substantially similar). They deliberately took advantage of the plaintiff's trust and gullibility to generate sales. Once the 21–31 securities issued, they spent the proceeds on

**8.** Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails ... (b) to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**9.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) to employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**10.** Section 17(a) provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

their business ventures as they saw fit and with disregard for the monies' represented use. This resulted in the irreplaceable diversion of 2131 Third Avenue's refurbishment funds, and proximately caused 21–31 Ltd.'s failure.

The 21–31 securities sold primarily by use of omission and half-truth, as opposed to misrepresentation. As previously indicated, the omissions were largely material such that "a reasonable investor might have considered them important" in his decision to buy. *Blackie v. Barrack*, 524 F.2d 891, 906 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Investor reliance and causation of injury are accordingly inferred from the proof and finding of materiality. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Austin v. Loftsgaarden*, 675 F.2d 168, 177–79 (8th Cir.1982); *Arthur Young & Co. v. United States Dist. Court*, 549 F.2d 686, 694–95 (9th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977); *Blackie v. Barrack, supra*, 524 F.2d at 906.

As indicated, however, outright misrepresentation was also used in selling the 21–31 securities. Misrepresentations in fact permeated the limited partnership offering material, as well as the partnership and trust deed oral sales presentations, the latter proceeding under the guise of a financial planning relationship. Because the uniform offering materials, WIN agents, and CSCC's purported financial planners provided the sole source for information about the 21–31 securities, the court finds that defendants' affirmative misrepresentations also induced reliance on plaintiffs' part.

█ No defendant rebutted the showing and inference of reliance, nor did any defendant otherwise rebut the showing of causation. The developer defendants and WIN are accordingly liable to all plaintiffs under the anti-fraud provisions of the 1933 and 1934 Acts, as well as under Rule 10b–5, and common law fraud and deceit (codified at California Civil Code §§ 1709, 1710).

Defendants Brophy and Pulvers are additionally liable under § 10(b), Rule 10b–5, and § 17(a) as control persons of CSCC and WIN (15 U.S.C. § 77o ; 15 U.S.C. 78t(a) ), and as aiders and abettors of those entities' fraud (*Harmsen v. Smith, supra*, 693 F.2d at 943). CSCC is also liable as a control person of WIN.

The developer defendants and WIN's liability under Rule 10b–5 extends to each subsection thereunder (17 C.F.R. § 240.-10b–5(1), (2), and (3); *Shores v. Sklar*, 647 F.2d 462, 469–70 (5th Cir.1981), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983) ). In addition to the misrepresentations and omissions, the developer defendants' actions in holding themselves out as disinterested financial planners was intended to and did operate as a scheme to fraudulently bring the 21–31 securities onto the market. The defendants knowingly conspired to effect this scheme in order to market securities not entitled to be marketed. The plaintiffs relied on the developer defendants' purported expertise and disinterested status, as well as on the availability of the 21–31 securities, as an indication of the trust deed and limited partnership interests' apparent marketability and lawful status. Plaintiffs' losses flow directly from their reasonable, if mistaken, reliance on the developer defendants' scheme.

█ Defendant Cheyne, however, lacked the requisite scienter, and is not liable under any of the claims based in fraud. While Mr. Cheyne's culpable state of mind approaches, it does not reach the threshold of recklessness. And while he was clearly negligent in providing substantial and necessary assistance for his codefendants' fraudulent securities scheme, plaintiffs' proof falls short of showing his actual knowledge in the wrong and of his role in furthering it at the time he rendered his services. While the court views this as a very close question, when plaintiffs' proof is viewed against Mr. Cheyne's relative youth and inexperience, he is entitled to the benefit of the doubt.

*Negligent Misrepresentation and Breach of Fiduciary Duty*

The findings and conclusions previously recounted alternatively support liability against the developer defendants and WIN as to all plaintiffs under the pendent claim of negligent misrepresentation (Cal.Civ. Code § 1710(2), (3); *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra,* 57 Cal. App.3d at 110, 128 Cal.Rptr. 901). Mr. Cheyne's liability under this theory is coextensive with his liability for legal malpractice—discussed below.

■ The developer defendants and WIN additionally stood in a fiduciary relationship with plaintiffs. Fiduciary obligations arose by virtue of their purported disinterested financial planner status, their broker/agent status, and/or from the control they exercised over 21–31 Ltd. *Credit Managers Assn. v. Superior Court,* 51 Cal. App.3d 352, 360, 124 Cal.Rptr. 242 (1975); *Cooper v. Jevne,* 56 Cal.App.3d 860, 866, 128 Cal.Rptr. 724 (1976); *cf. Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969). By their numerous omissions and nondisclosures they breached their fiduciary obligation of full disclosure, rendering them liable for constructive fraud. Moreover, the developer defendants breached a fiduciary obligation owing the limited partners by managing 21–31 Ltd. in a manner calculated to benefit them personally and with disregard for the best interests of the limited partners. This resulted in the diversion of the funds allegedly intended for refurbishment, ultimately causing plaintiffs' losses.

*Legal Malpractice*

The limited partners went to trial against Mr. Cheyne alleging legal malpractice.[11] As mentioned, Mr. Cheyne acted as counsel to both 21–31 Ltd. and CSCC. It was in this dual capacity that he negligently opined to the exempt status of the 21–31 Ltd. limited partnership interests, and transmitted this opinion via the offering materials directly to the limited partner investors.

■ Under California law it would appear that in rendering advice on the legality of the 21–31 Ltd. partnership interests, Mr. Cheyne owed the limited partners a duty of care. *Goodman v. Kennedy,* 18 Cal.3d 335, 342, 134 Cal.Rptr. 375, 556 P.2d 737 (1976). The effect on the limited partners of issuing their interests as purported exempt securities is apparent and was foreseeable; it wrongfully deprived them of the protections afforded by qualification and registration. They were persons who, together with CSCC, would foreseeably rely on his opinion, and whose reliance was in fact intended. The policy of preventing future harm favors finding a duty of care in giving this advice running directly to the limited partners, and the court finds one did. By negligently opining to the limited partnership's exempt status, Mr. Cheyne breached that duty and, without that opinion, it is probable the plaintiffs would never have invested to their detriment. Accordingly, Mr. Cheyne is liable for legal malpractice. *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra,* 57 Cal.App.3d at 104, 128 Cal.Rptr. 901.

*Damages*

As indicated at the close of trial, plaintiffs' proper remedy is rescission. This is an appropriate remedy under each cause of action herein. 15 U.S.C. § 771; Cal.Corp. Code § 25503; *Blackie v. Barrack, supra,* 524 F.2d at 909; *Burgess v. Premier Corp., supra,* 727 F.2d at 837. In addition to the return of initial investments, defendants are liable for any subsequent capital assessments.

■ Plaintiffs are also entitled to prejudgment interest under each theory of recovery. Under the federal securities law, this award is governed by federal law (*Mallis v. Bankers Trust,* 717 F.2d 683, 692 n. 13 (2nd Cir.1983) ), and is discretionary with the court (*Whittaker v. Whittaker Corp.,*

---

11. It was determined prior to trial that the trust deed investors did not have a claim for legal malpractice against Mr. Cheyne (*See* Memorandum Decision herein dated January 30, 1985).

639 F.2d 516, 533–34 (9th Cir.), *cert. denied,* 459 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981)). Fairness suggests that if plaintiffs are to be made whole for the wrongful dissipation of their money, they should be compensated for the period of time they were deprived of its use. Under the pendent claims, it appears that prejudgment interest is mandatory for fraud, and discretionary in other instances (Cal. Civil Code § 3288). Similarly, Cal.Corp. Code §§ 25501, 25503 provides for prejudgment interest as part of damages at the legal rate.

## Interest Rate

■■■■ The interest rate under the pendent claims must be awarded at California's legal rate, 7% per annum. *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1522–23 (9th Cir.1985); Cal.Const.Art. 15, § 1. Defendants contend that because the federal securities laws do not provide for a rate of interest, California's legal rate should apply. While one district court has applied the state rate under these circumstances (*McLish v. Harris Farms, Inc.,* 507 F.Supp. 1075, 1088 (E.D.Cal.1980)), it was not compelled to do so, and federal law controls. *Mallis v. Bankers Trust, supra,* 717 F.2d at 692; *Western Federal Corp. v. Davis,* 553 F.Supp. 818, 821 (D.Ariz.1982), *aff'd sub nom Western Federal Corp. v. Erickson,* 739 F.2d 1439 (9th Cir.1984). Under federal law, prejudgment interest is to be set at a rate which fairly compensates the defrauded party. This permits, and arguably compels, use of a market rate of interest. *Western Federal Corp. v. Davis, supra,* at 821; *The Johns Hopkins University v. Hutton,* 297 F.Supp. 1165, 1228, *aff'd in part, rev'd in part,* 422 F.2d 1124 (4th Cir.1970), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). The court adopts the average rate for money market instruments in federal funds during the relevant period. Plaintiffs' actuary sets this at 10.38%, a calculation defendants have not opposed.

## Date of Investment

■■■■ Prejudgment interest shall be calculated from the date of investment. Plaintiffs' pleadings submitted in connection with the hearing on damages calculate the median date of purchase weighted for amount of investment. Whether this procedure is utilized or interest is calculated on each individual investment, the result is the same.

## Setoffs

Issues of what items may properly be set off, and the calculation of interest in light of setoffs, are addressed below.

Only approved partial settlements already distributed to the class (or its counsel) may be set off at this time against the gross amount due. In regard to the $300,000 paid by defendants Niebrugge and Stewart, 64.471% was distributed for the benefit of the class and its counsel herein, the remainder going to plaintiffs in a related action. Only that percentage distributed in this action may be set off. In addition, $11,980.40 paid in settlement by defendant ADP, Inc. and the $8,500.00 contributed by settling defendants Hoffman and Salganick may also offset the judgment.

The stipulated but unapproved settlements with defendants Williams and FPEC shall not, at this time, however, be treated as setoffs. In the event those settlements are ultimately approved and funded, judgment can be amended to reflect payment at that time.

Prior to December 1981, 21–31 Ltd. paid some returns on the trust deed investments. They totaled approximately 26% of the Lots A–D capital investment, and 2% of the Lot J capital investment. To the extent these interest payments are documented, they shall be set off against the award.

Defendants have contended that certain monies deposited by plaintiff Jackson with the Clerk of the Court should also offset judgment. The court disagrees.

■■■■ On May 2, 1984, Mr. Jackson deposited with the Clerk approximately $60,-

000 he received as a judgment creditor of defendant CSCC on an obligation separate and distinct from his claims as a limited partner herein. This money was deposited to make all dealings with CSCC a matter of public record as to avoid any appearance of a conflict of interest with his co-plaintiffs.

Defendants could only claim this amount as a setoff if it had been paid in compensation for the same torts or wrongs litigated under the Fourth Amended Complaint. Cal.Code Civ.Proc. § 877; *Carr v. Cove*, 33 Cal.App.3d 851, 854, 109 Cal.Rptr. 449 (1973). Evidence at trial establishes the separate nature of the obligation giving rise to the judgment partially satisfied by the May 1984 payment deposited with the Clerk. Accordingly, there is no justification for setting this amount off against the judgment.

■ Defendants also contend they should benefit from any tax reductions plaintiffs may have realized as a result of their investments. Given the discrepancy between investor suitability requirements and projected tax savings, and the lack of adequate proof on the issue, it is neither appropriate nor practicable to deduct such amounts, if any, from the award. *Cf. Burgess v. Premier Corp., supra,* 727 F.2d at 837–38.

■ Prejudgment interest under the pendent claims must be applied to the net rather than the gross amount due. "Under California law, a court may award [prejudgment] interest only on the balance found to be due after deduction of offsets. (citations)." *Davis & Cox v. Summa Corp., supra,* 751 F.2d at 1522–23 (diversity action). Accordingly, the "interest on the balance due rule" properly applies to recovery upon the state based claims.

■ The same result, however, does not necessarily follow under the federal securities claims. The alternative is to calculate interest on the net amount due, and then deduct setoffs from the product. *Cf. Ralston Purina Co. v. Parsons Feed & Farm Supply, Inc.,* 416 F.2d 207, 211 (8th Cir. 1969) (considering the alternatives, but ap-

plying the "interest on the balance rule"). The interest on the balance rule assumes that plaintiffs had use of the setoff for the duration of litigation. The "interest on the entire claim rule" assumes that plaintiffs were denied use of the setoff until judgment entered.

In choosing between these rules this court is guided by its rationale for awarding prejudgment interest: to compensate plaintiffs for the loss of use of their investment capital. The interest earned and returned under the trust deeds was paid prior to December 1981, and plaintiffs have had use of those funds for four of the past five years. It follows that the interest on the balance rule more closely approximates the realities of that setoff. Accordingly, interest payments received should be deducted from the gross award prior to calculation of prejudgment interest.

The settlement proceeds, in contrast, were paid only months prior to trial. The interest on the entire claim rule more closely approximates the realities of those setoffs. Accordingly, the award (reduced by pre-default interest payments) shall be augmented by prejudgment interest prior to deduction of setoffs reflecting partial settlements.

### Punitive Damages

■ As indicated at the close of trial, the circumstances resulting in liability under the pendent claims of fraud and breach of fiduciary duty support an award of punitive damages against all defendants liable thereunder except Mr. Pulvers. Cal.Civil Code § 3294; *Walton v. Anderson,* 6 Cal. App.3d 1003, 1008–10, 86 Cal.Rptr. 345 (1970). Those defendants took advantage of unsophisticated, trusting, and often elderly persons, and treated proceeds raised as an unrestricted pool of funds for their business ventures. They acted with little or no consideration for the investors' best interests, or for the impact their actions would have on plaintiffs' lives. Their overarching motive was to generate commissions, and they pursued their objective with malice and disregard for the risk at which

they placed investors' savings. The tape recordings of management meetings were most instructive in this regard.

Two factors distinguish Mr. Pulvers from the others. First, his youth compares favorably with Mr. Brophy's demonstrated sophistication. Second, unlike Mr. Brophy, he did not abandon CSCC as its several partnerships (including 21–31 Ltd.) went into bankruptcy, but attempted to salvage what value he could from the failed projects. Accordingly, while this court is willing to find that the other developer defendants and WIN acted with malice, it does not make the same finding as to Mr. Pulvers.

Given the magnitude of the injury inflicted, an award of $500,000 punitive damages is appropriate.

### Attorneys' Fees

■ Section 11(e) of the 1933 Act permits the discretionary assessment of attorneys' fees as an item of damages if the defense of an action under the 1933 Act was "without merit." This "without merit" standard has been interpreted to mean "frivolous or in bad faith." *The Johns Hopkins University v. Hutton, supra,* 297 F.Supp. at 1228; *accord, Can-Am Petroleum Co. v. Beck,* 331 F.2d 371, 374 (10th Cir.1964) (fees not recoverable absent frivolous defense; *McLish v. Harris Farms, Inc., supra,* 507 F.Supp. at 1088 (fees not recoverable absent trivial defense). While defendants should have stipulated to additional facts, this court cannot find that their defense was without merit such that it bordered on being frivolous. In many aspects this case was close, and it was only after a careful consideration of the evidence in light of prevailing law that the court determined the grounds on which plaintiffs should prevail.

The limited partners, however, may recover their pro rata share of fees by contractual agreement. Section 18.7 of the 21–31 Ltd. partnership agreement provides:

> In any actions between the parties to enforce any of the terms of this Agreement or any other contract relating to the Limited Partnership or any action in any other matter pertaining to the Limited Partnership affairs of this Agreement, the prevailing party shall be entitled to recover the expenses incurred, including reasonable attorneys' fees.

This provision's scope is broad; it is not limited to actions in breach of contract ("to enforce any of the terms of this Agreement...."), but extends to "any action in any other matter pertaining to the Limited Partnership affairs of this Agreement." The court finds this properly includes the wrongs litigated under the Fourth Amended Complaint herein.

■ CSCC, as general partner, is signatory to the partnership agreement, and is liable for fees by operation of § 18.7. No other defendant, however, is a party to the agreement. Defendants Brophy and Pulvers signed the partnership agreement(s) in their corporate capacities (President and Secretary of CSCC respectively), but, individually, they are not bound by the agreement.

Plaintiffs urge that California Civil Code § 1717 [12] extends the agreement's fees provision to nonsignatories such as Mr. Brophy and Pulvers, as well as Mr. Cheyne. It is established, however, that even if one were willing to find Mr. Brophy and Mr. Pulvers alter egos of CSCC (which this

---

12. Section 1717 provides, in part:
(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of the contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the prevailing party, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements....

The sole purpose of this statute is to eliminate the unfairness of unilateral provisions for attorneys' fees by making their enforcement reciprocal. *Reynolds Metals Co. v. Alperson,* 25 Cal.3d 124, 158 Cal.Rptr. 1, 599 P.2d 83 (1979).

court is), § 1717 extends fees provisions to nonsignatories "only where fees are incurred to enforce .:. the contract." *McKenzie v. Kaiser-Aetna,* 55 Cal.App.3d 84, 89–90, 127 Cal.Rptr. 275 (1976); *accord, Reynolds Metals Co. v. Alperson,* 25 Cal.3d 124, 128, 158 Cal.Rptr. 1, 599 P.2d 83 (1979); *Pleman v. Nelson,* 148 Cal. App.3d 720, 724–25, 196 Cal.Rptr. 190 (1983).

Breach of contract is not among the wrongs alleged by the Fourth Amended Complaint. Plaintiffs sued in tort and under the securities laws; they did not bring suit to enforce the partnership agreement. "A tort action for fraud arising out of a contract is not ... an action 'on a contract' within the meaning of this section [§ 1717]." *Stout v. Turney,* 22 Cal.3d 718, 730, 150 Cal.Rptr. 637, 586 P.2d 1228 (1978). Accordingly, the limited partners may recover their pro rata share of attorneys' fees and costs, but only from CSCC.[13] The amount to be awarded as fees and costs, however, remains to be determined upon proper application. Once it is determined, the judgment can be amended at that time.

## CONCLUSION

Plaintiffs shall prepare a proposed judgment consistent with this decision and the court's findings at the conclusion of trial, approved as to form by defendants. Because this action remains pending as to several defendants whose stipulated settlements remain to be approved, the judgment directed above should address only the claims against defendants WIN, CSCC, Brophy, Pulvers, and Cheyne. Once the court enters such judgment, there being no just reason for delay, it shall be considered final as to those defendants for purposes of Rule 54(b), Fed.R.Civ.P.

---

**13.** Unlike the partnership agreement, the notes issued for the benefit of the trust deed investors do not contain broad provisions for recovery of attorneys' fees. For instance, the Lots A–D notes provide for the recovery of "such sums as the court may fix as attorneys' fees," but only "[i]f action be instituted on this note." As indicated, plaintiffs have not stated a claim for breach of contract, and no attorneys' fees are owing the trust deed investors.