[Civ. No. 12048. Third Dist. Apr. 27, 1970.]

A. BRUCE WALTON, JR., Plaintiff and Respondent, v.
KEITH ANDERSON et al., Defendants and Appellants.

1004

COUNSEL

Young & Nareau, John A. Young, Downey, Brand, Seymour & Rohwer, Ronald N. Paul and Garth L. Scallon for Defendants and Appellants.

King & Mering and Harold T. King for Plaintiff and Respondent.

OPINION

PIERCE, P. J.—Defendants, participants in an unauthorized sale of corporation stock to plaintiff, appeal from the judgment entered against them in a court-tried case awarding plaintiff compensatory damages ($40,500), as well as assessing punitive damages ($5,000, $1,000 respectively) against defendants Anderson and Wood.[1]

Defendants Anderson and Wood submit two contentions on appeal: (1) That the evidence was insufficient to support the award of compensatory damages in that it showed without conflict that defendants acted in good faith and upon reasonable investigation when they accepted money from plaintiff for the purchase of shares to be issued; and (2) that the award of punitive damages was contrary to law under the circumstances disclosed by the evidence in the case.

The evidence in the record, including inferences properly drawn by the trial court, justifies the allowance of both compensatory and punitive damages as awarded, and we will affirm the judgment.

H. & A. Distributing Co., Inc. (H. & A.) was a Fresno-based California corporation. It had been organized originally by appellant Keith Anderson and one Hastings in 1962. The latter was still its manager when the events out of which this litigation arose took place. In January 1967 Hastings was president, Anderson was vice president and Badger was secretary. Appellant, R. E. Wood, was the treasurer. He was, and had been for 11 years, a registered public accountant, and was the accountant for Anderson in another corporation, Handy Andy TV & Appliances, Inc., with a net worth of $700,000. Anderson—except for a few shares owned by Wood—was the sole owner of that corporation.[2] Wood was also active in the affairs of

---

[1]Defendant Badger does not attack the judgment, but filed notice of appeal in order to protect himself in the event that the portion of the judgment awarding compensatory damages is reversed.

[2]Besides H. & A. and Handy Andy TV, Anderson was also a shareholder in a number of other corporations, including 5-A Investment Company, a family corporation, Capitol City Service Company (which finances accounts receivable) and other

H. & A. It may be assumed that some of his duties were connected with accounting. In Anderson's testimony are several references to directions given by him to Wood to perform various duties relating to the affairs of H. & A. Hastings, Anderson, Badger and Wood were the directors of the corporation. That corporation had applied to, and received a permit from, the Corporations Commissioner of California to sell two separate issues of capital stock, each being for 250 shares, authorized to be sold at $100 per share for cash. As a result of these sales, at the time of the negotiations with Walton to be related below, Anderson owned (in dollars at par value) $25,000, Hastings $15,000 and Badger $12,000.

The corporation was a wholesaler for Sylvania products, principally television sets. That company wanted H. & A. to increase its working capital. Badger and plaintiff, Bruce Walton, were friends who met frequently at a Sacramento country club. Badger was the golf professional at that club. Walton had money to invest. Walton knew of Badger's interest in H. & A., and through Badger he had learned of Anderson's interest therein. He also knew of Anderson ("Handy Andy") as a business man with many years' experience in TV enterprises.

As the result of an original contact by Badger several meetings were held between Walton, Anderson and Badger. Before those meetings, however, on January 3, 1967, a meeting of the directors was held in Fresno. At that meeting three of the four directors were present, Anderson, Hastings and Badger. Badger told the others about his meeting with Walton. The minutes of the corporation (in evidence) reflect that the directors discussed the corporation's need for $180,000. Not all of that money was needed for the expansion capital asked for by Sylvania. As of November 30, 1966, H. & A. had a deficit of $31,153. It was decided to solicit a stock purchase from Walton of $40,500.

During the subsequent meeting between Walton, Anderson and Wood (at one or more of which Badger was present), it was represented to Walton that Hastings had been doing a good job which would be reflected in the company's balance sheet. They told Walton the company was in good financial shape, that when it had started it was "in the red" but that the manager (Hastings) had pulled it out. They showed Walton a pencil-written balance sheet indicating the company had made money in 1966. The trial court, however, was also justified in drawing the inference—and it was a fair one—that Hastings had not been doing a good job, that the company was not in good financial condition. It was losing money at the time of the sale to Walton and, due to the mismanagement of Hastings, seven months

businesses, including Suburban Ford. He had had long experience in the radio and television sales business.

thercafter it was in bankruptcy. Although appellants testified they were not aware of that mismanagement until early in June, the documentary evidence —consisting of the entire file of the Corporation Commissioner is in evidence, and from it the court was reasonable in its belief that Anderson and Wood were aware of the mismanagement and the plight of the corporation much earlier.

On February 2, 1967, Walton delivered his check to H. & A. in the sum of $40,500 and was given a receipt showing that he was to receive 270 shares of H. & A. capital stock (at $150 per share). There was nothing in the receipt informing Walton that an application for a permit would be required before the shares could be issued. Anderson's testimony is equivocal as to whether Walton was so advised. (Anderson testified: "Q. Was the permit mentioned? Do you recall? A. I do not recall. No.") Walton testified he believed when he bought and paid for the shares that he would receive them forthwith. Appellants admitted they knew an application would have to be made before shares could be issued.

Notwithstanding, the $40,500 obtained from Walton was immediately deposited in H. & A.'s bank account and apparently used by the corporation in its short-lived remaining period of business existence. Anderson stated that he told Wood to instruct the corporation's attorney to apply for a permit, and Wood testified that he did so and remonstrated with the attorney over the delay. Nevertheless, no permit was applied for until May 22, 1967. In that application an issue of shares to Walton, Anderson, Hastings and Badger was proposed. Yet the testimony of Anderson was they did not then plan to purchase shares. The financial statement of the corporation, then six months old and showing a large deficit, accompanied the application. The permit was never granted. No shares were ever issued to Walton. It is obvious from a reading of the Corporation Commissioner's file that no permit could possibly have been issued on the application submitted. It is inferable that the entire proceedings for a permit were taken with a realization that they were foredoomed.

The complaint was in two counts. It included the allegations: "That by offering to sell and by selling said stock to plaintiff, defendants represented to plaintiff that a permit for the sale of said stock had been obtained from the Commissioner of Corporations of the State of California, but said representation was false and fraudulent and was made with the intention to deceive plaintiff and in truth and in fact no such permit has at any time been obtained by the defendants or any of them.

"That plaintiff would not have paid the purchase price for said stock had he known no permit for the sale thereof had been obtained from the Commissioner of Corporations of the State of California."

The trial court found that defendants Anderson and Wood knowingly, deliberately and wilfully sold unissued shares to Walton for $40,500, representing that a permit had been obtained for the sale of said shares, when in fact no permit had then, or was thereafter, issued, and that those defendants knew they had no legal right to sell the shares and that the representation was false. The court further found that these representations induced plaintiff to purchase the shares and was thereby damaged (a) in the sum of $40,500 plus interest in compensatory damages, and (b) punitive damages as stated above.

### COMPENSATORY DAMAGES

█ The record presents no difficulty to this court on the issue of compensatory damages. Even good faith, had it been shown, would not be a defense in an action to recover the purchase price paid for shares sold without, or in advance of, authorization in the form of a permit issued by the Commissioner of Corporations to sell securities, but is only relevant to a determination of the applicable statute of limitations since the action may be based on any one of three theories: fraud, warranty or money had and received. (Code Civ. Proc., § § 338, subd. 4, 339, subd. 1; Corp. Code, § 25000 et seq.; *Mary Pickford Co.* v. *Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 525-526 [86 P.2d 102]; *Maner* v. *Mydland* (1967) 250 Cal.App.2d 526, 532-537 [58 Cal.Rptr. 740]; *N. C. Roberts* v. *Topaz Transformer Products, Inc.* (1966) 239 Cal.App.2d 801, 818 [49 Cal.Rptr. 209]; *Gormly* v. *Dickinson* (1960) 178 Cal.App.2d 92, 102-103 [2 Cal.Rptr. 650]; see also Dahlquist, *Regulation and Civil Liability Under the California Corporate Securities Act* (1946) 34 Cal.L.Rev. 543, 554-560; 695, 701-710.)

### PUNITIVE DAMAGES

Respondent concedes that no case has been found, and we have not found one, in which an allowance of punitive damages has been awarded in a case in which there was a sale of shares without a permit. To that extent this is a case of first impression. The trial court *might* have found, had it believed the testimony of Anderson and Wood absolutely, that the two acted in good faith and had no knowledge that the corporation was in perilous financial condition when they took (and spent for the corporation) Walton's money prior to obtaining a permit and that a permit could not be obtained to issue shares promptly. But the court, as we have seen, did not believe that.

█ Under the substantial evidence rule, binding upon this reviewing court, the court did not have to, and did not, believe their testimony. (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 787 [59 Cal.Rptr. 141, 427 P.2d 805].) This is not a case like

*Marovich* v. *Central Cal. Traction Co.* (1923) 191 Cal. 295, 304 [216 P. 595], where, if the trier of fact disbelieves a witness testifying to the negative of an issue, there is no evidence to support the affirmative. We have read the evidence, including the entire record of the Commissioner of Corporations, very carefully. We have stated that evidence above, resolving inferences reasonably to be drawn from the evidence in favor of respondent as the substantial evidence rule requires us to do.

■ A trial court may not engage in mere speculation and conjecture. Evidence must have ponderable significance. When inference upon inference must be built, an ultimate inference may be so remote from the evidence that it should be rejected. (*Traxler* v. *Thompson* (1970) 4 Cal.App.3d 278, 286 [84 Cal.Rptr. 211], hg. den.)

Frequently a determination of the distinction between mere speculation and conjecture on the one hand and fair inference on the other may present a difficult question.

"In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294.) ■ Although an action may be based upon a contract, if it also properly contains a count ex delicto upon which plaintiff relies, it falls within the section quoted when fraud, oppression or malice exists. (*Haigler* v. *Donnelly* (1941) 18 Cal.2d 674, 681 [117 P.2d 33·1].) ■ The Civil Code section speaks of "implied" malice and seems to embrace it. But California follows the general rule and requires a showing of *malice in fact* or *actual malice*. (See 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 396, p. 1599, and cases there cited.) Inference of *actual malice*, nevertheless, may be drawn from circumstances. (*Toole* v. *Richardson-Merrell Inc.*, 251 Cal.App.2d 689, 713 [60 Cal.Rptr. 398], hg. den.)

The *Toole* case at page 713 cites *Wolfsen* v. *Hathaway* (1948) 32 Cal.2d 632, 650 [198 P.2d 1]. *Wolfsen* is a case relied upon by appellants as declaring a rule that plaintiff must show hatred and ill will. The rule we take from *Wolfsen*, however, is that oppression, fraud or malice cannot be established or founded upon "mere speculation." (*Wolfsen* at p. 650.)

*Roth* v. *Shell Oil Co.* (1960) 185 Cal.App.2d 676 [8 Cal.Rptr. 514] (hg. den.) is a case where conversion was involved but the decision pointedly distinguishes "mere speculation" from evidence adequate to justify an inference of malice. It states on page 683: "Since the jury awarded punitive damages, it impliedly found not only that defendant had committed a tort, but also that it acted with malice or intent to oppress. Notwithstanding the

testimony of defendant, the jury might well have believed that defendant intended to oppress these plaintiffs."

In *Sturges* v. *Charles L. Harney, Inc.* (1958) 165 Cal.App.2d 306 [331 P.2d 1072] (hg. den.), the court states at page 321: "'Malice in fact cannot be presumed; its existence must be found as a fact by the jury, although it may be proved either by direct evidence of declarations, or by an inference drawn from the acts or conduct of the defendant.' "

Sturges sums up the malice needed as " 'only one kind—the malice of evil motive.' " (*Id.* p. 321.) When there is express fraud there is evil motive. The latest case by our Supreme Court referred to us is a case where there was express fraud. It is *Ward* v. *Taggart* (1959) 51 Cal.2d 736 [336 P.2d 534], where the court says at page 743: "Courts award exmplary damages to discourage oppression, fraud, or malice by punishing the wrongdoer. (See McCormick, Damages, § 79; Morris, *Punitive Damages in Tort Cases,* 44 Harv.L.Rev. 1173, 1185-1188.) ■ Such damages are appropriate in cases like the present one, where restitution would have little or no deterent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained. [Citations.] The record herein discloses no abuse of discretion in the award of exemplary damages."

We hold that the trial court drew reasonable inferences that express fraud existed in this case and substantial evidence supports the court's findings.

Judgment is affirmed.

Friedman, J., and Janes, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 24, 1970.