In re George Frederick KLAUSE, Debtor.

George F. KLAUSE, Plaintiff,

v.

Donald R. THOMPSON and Patricia
A. Thompson, Defendants.

Donald R. THOMPSON and Patricia
A. Thompson, Counterclaimants,

v.

George F. KLAUSE, Counterdefendant.

Bankruptcy No. LA 93–32877–GM.
Adv. No. LA 93–02891–GM.

United States Bankruptcy Court,
C.D. California.

April 24, 1995.

Alan Friedman and Nicholas Miller, Tuttle & Taylor, Los Angeles, CA, for defendants and counterclaimants Donald R. and Patricia A. Thompson.

Joseph Eisenberg, Levene & Eisenberg, Jeffrey Lee Costell, Stephen Joelson, Costell & Joelson, Los Angeles, CA, for debtor George F. Klause.

## MEMORANDUM OF OPINION AS TO PUNITIVE DAMAGES AND ATTORNEYS' FEES

GERALDINE MUND, Bankruptcy Judge.

In June 1989 George Frederick Klause purchased the Palm Crest, a sixty-two unit apartment building in Riverside, for $3,472,-

000. At the time of sale, the Palm Crest had a contract with nearby University of California at Riverside to use the apartments (all furnished) as a freshman dormitory. After the purchase, however, the building began to experience financial problems. At the close of the school year, students moved out for the summer, but they would not return the following fall. Due to the opening of a new dormitory on campus, the university declined to renew the Palm Crest contract. Because of complaints from students and parents concerning problems with security deposit refunds, the university also did not place the building on the approved housing list. After that, it became more difficult to find students and other tenants for the building, and managerial problems increased. In an attempt to fill units, Klause was forced to make rent concessions and to admit tenants with questionable credit histories. This new pattern resulted in reduced cash flow, which worsened throughout 1989 and into 1990.

In an effort to hide the Palm Crest's financial woes, between December 1989 and April 1990 Klause told a series of lies regarding the Palm Crest. These misrepresentations provided a foundation to make subsequent lies believable. During that time period, Klause had the building appraised three times. In each instance, he supplied the appraiser with false data concerning occupancy, leases, rents received, and rent concessions. The Court infers that Klause ordered repeated appraisals so that he could sell or refinance at a higher value than the building was worth. In addition, he failed to reveal prior appraisals, gave improper information about the number of students, and falsified the number of vacancies.

Meanwhile, George and Pat Thompson, an elderly couple who had previously managed small apartment buildings, were searching for a new investment. Their broker showed them a prospectus for the Palm Crest Apartments, which indicated monthly rents of about $42,000. The Thompsons agreed to purchase the building from Klause for $4,050,000, contingent on their inspection of the building and their review of the rent rolls and income and expense statements for the prior year.

Although Mr. Thompson signed escrow instructions which stated that he inspected the premises and the books and records, in fact the Thompsons had not received the income and expense statements, and Mr. Thompson's inspection of the building was limited by the direction of the building manager to a visit to ten of the inhabited units. Apparently, Klause saw to it that the building manager displayed to the Thompsons and appraisers only those units which supported his lies. Furthermore, while the Thompsons did review some records, they did not know that Klause had given them forged and fraudulent rent rolls and leases in order to give the false appearance of substantial occupancy and high rental income from the building. Unbeknownst to the Thompsons, when escrow closed on September 20, 1990, rental income had declined to $29,167. Not until after the closing did the Thompsons become aware that the building described in the rent roll and prospectus was not the building they received.

Through no fault of the Thompsons, by October 1990, the number of nonpaying units was up to thirty five and rent revenue was a mere $17,060, more than $8,000 below the $25,646 monthly loan payment due to the bank. In addition, finding new tenants became even more difficult due to the California recession, the Gulf War (which removed substantial military personnel from the area), and the fact that the university semester had begun several weeks earlier.

Shortly thereafter, the Thompsons entered into negotiations with Home Savings, holder of the first deed of trust, who had also relied on Klause's false rent rolls. The bank had the building reappraised and determined that its value was $3,265,000. The bank was willing to defer payments but not to forgive them. Finally in April 1991, Home Savings foreclosed on the Palm Crest and evicted all tenants. A year later, the bank sold the building to Edward Mickus under generous terms. Ironically, Mickus is somehow affiliated with Klause, and Klause again has a hand in management of the building.

Meanwhile, after foreclosure, the Thompsons sued Klause, both real estate agents, the broker and the escrow company, and the

matter was set for arbitration. Before arbitration, however, Klause filed a Chapter 11 bankruptcy petition and quickly filed an adversary proceeding to have the alleged debt to the Thompsons declared dischargeable. The Thompsons counterclaimed for a determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2) and (a)(6). This Court determined that the Thompsons would bear plaintiff's normal burden of proof and also the burden of going forward.

The trial was divided into two sections. During the initial seven days of trial, the court ruled on the value of the Palm Crest and each of the elements of § 523(a)(2) and § 523(a)(6). The issues of attorney's fees and punitive damages were continued for discovery. This was heard on December 22, 1994.

Prior findings pertained to the credibility of witnesses and the value of the property. The Court found that Klause is a liar and that his testimony is not credible. By contrast, the Court found the Thompsons to be substantially credible and attributed flaws in Mr. Thompson's testimony to the passage of time and faded memories.

The value of the building is a major issue in this case and, after considering five relevant events, the Court found the value at the time of each of those events to be: $3,172,000 when Klause purchased the building in June, 1989; $3,000,000 unfurnished when the prospectus was prepared in or about January, 1990; $3,100,000 when the purchase agreement was entered into in April, 1990; $2,875,000 when escrow closed in September, 1990; and $2,875,000 when Home Savings foreclosed in May, 1991.

To prevail under 11 U.S.C. § 523(a)(2)(A), the Thompsons had to prove the elements of common law fraud.[1] To obtain punitive damages, they were required to prove their case by clear and convincing evidence. Cal.Civ. Code § 3294. It is undisputed that Klause made numerous false representations upon which he intended the Thompsons to rely,

which the Court concludes were material. The Court further found that, while the Thompsons may not have demonstrated stellar business judgment, their reliance on Klause's misrepresentations was nevertheless reasonable, because they acted under the belief that Klause was an honest business man. Only if they had operated under the belief that Klause was a liar could they have avoided being duped by him. From the Court's perspective, Klause did everything in his power to make sure his fraud was not visible to anyone. The Court further found that the Thompsons suffered a detriment due to Klause's misrepresentations. As a result, the Court concluded that all of the issues required under § 523(a)(2)(A) were either admitted by Klause or that there was clear and convincing evidence in support of the Thompsons.

■ Under 11 U.S.C. § 523(a)(6), liabilities based on intentional torts are nondischargeable where the debtor "willfully and maliciously" injures another person or the property of another person. To prevail, it was not necessary for the Thompsons to prove that Klause had specific intent to cause the injury to them, nor that he had knowledge of the probable consequences of his acts. "When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986).

From the depth and detail of his scheme of lies, this Court concluded that Klause had the intent to willfully and maliciously injure another entity. Klause falsified many documents specifically so that the Thompsons would pay him hundreds of thousands of dollars more than the building was worth, and the harm to the Thompsons was not so much the loss of the building to foreclosure as the over-encumbrance of the property due to Klause's acts. The Court found that a prima facie case under § 523(a)(6) had been

---

1. "To establish nondischargeability the complaining creditors must prove that the debtor: (1) made the representation (2) which he (she) knew was false at that time (3) with the intent and purpose of deceiving the creditors (4) on

which the creditors relied, and (5) that the creditor sustained a loss as the proximate result of the false representations." *In re Drayman,* 77 B.R. 773, 775 (Bankr.C.D.Cal.1987); *In re Taylor,* 514 F.2d 1370, 1373 (9th Cir.1975).

proven by clear and convincing evidence and was not dissuaded by Klause's mitigation defense and risk of market downturn defense.

On the basis of these findings, the Court held that the Thompsons are entitled to compensatory damages in the amount of $922,833.23 with 7% interest from April 10, 1990 on the $50,000 deposit and from September 20, 1990 on the remaining $872,833.23.

The Thompsons also sought punitive damages and attorney's fees. On December 22, 1994 the Court took testimony on those issues and then submitted the matter for further briefs.

## PUNITIVE DAMAGES

### Does Federal or State Law Apply?

Most of the reported cases concerning punitive damages deal with a judgment given by the state court or the District Court, often by a jury. The parties then want the Bankruptcy Court to determine whether that judgment is dischargeable in the bankruptcy. In the present case the dispute never went to trial before bankruptcy and this judge is the initial trier or fact. Since this Court must determine whether to grant punitive damages, the question arises as to what standard of law should be applied.

*In re Adams,* 761 F.2d 1422 (9th Cir.1985) gives some guidance. The defendant in a drunk driving case filed bankruptcy before the state court action was tried. This was in 1983 when there was substantial confusion concerning jurisdiction due to the decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The district judge withdrew the reference, bifurcated the case and tried the liability and damages portion to a jury (apparently using state law). Then he held a bench trial on the issue of dischargeability of that award for compensatory and punitive damages. The Ninth Circuit affirmed the judgment by the court that

the jury's verdict was non-dischargeable under 11 U.S.C. § 523(a)(6).

■ With the passage of the 1984 amendments, there is no reason for this Court to create two triers of fact (a judge and a jury). Klause is not entitled to a jury trial since he is a debtor in bankruptcy and is the defendant in a core proceeding. Moreover the Court is not aware that Klause filed a demand for jury and this issue was never raised before or during the trial.

■ However the Court agrees with the general principle used in *In re Adams.* First the trier of fact looks to state law to determine whether there is liability and the amount of compensatory and punitive damages and then the trier of fact determines whether that set of facts qualifies as a non-dischargeable claim under the bankruptcy law.[2]

With respect to the award of punitive damages, the "bifurcated view" of § 523 proceedings above aids the Court in determining whether to award punitive damages. If the parties do not bring forth a basis in state or federal non-bankruptcy law for awarding punitive damages, then no punitive damages can be given.

Here, the Thompsons are bringing a fraud claim under state law. Thus, they may rely on state statutes as a basis for seeking punitive damages.

### Cal.Civ.Code § 3294 Allows Punitive Damages

■ Cal.Civ.Code § 3294 states that "additional" damages may be given in tort actions where the defendant's conduct has been outrageous, morally culpable or in conscious disregard of the rights of others, for the purpose of punishing him and deterring him and others from such conduct in the future. Civil Code § 3294 specifically provides for the allowance of punitive damages in the case of fraud.[3] If fraud is found, the

---

2. Although most of the cases talk about the jury awarding punitive damages, it is the trier of fact who undertakes this action, whether that is the jury or the judge. *Devlin v. Kearny Mesa AMC/Jeep/Renault,* 155 Cal.App.3d 381, 388, 202 Cal.Rptr. 204 (1984).

3. Civil Code § 3294 provides:
 (a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual

Court may award punitive damages. This applies when the fraud involved concerns the purchase of property. Cal.Civ.Code § 3343; *Bagdasarian v. Gragnon,* 31 Cal.2d 744, 192 P.2d 935 (1948).

■ For purposes of punitive damages, evidence of the fraud must be by clear and convincing evidence. Clear and convincing evidence means evidence sufficient to support a finding of "high probability." Civ.Code § 3294(a); *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1105 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993).

■ Under California law if the Court finds that the actions of the defendant are oppressive, fraudulent or malicious, punitive damages are particularly appropriate as a matter of public policy where a plaintiff seeks restitution. This is because restitution has little deterrent effect as the wrongdoer runs no risk beyond returning what was wrongfully obtained. *E.g., Walton v. Anderson,* 6 Cal.App.3d 1003, 1009, 86 Cal.Rptr. 345 (1970).

### *Punitive Damages May be Awarded Under § 523(a)(6)*

■ The Thompsons assert that their claim for punitive damages based on fraud is excepted from discharge under § 523(a)(6). Generally, punitive damages are nondischargeable under § 523(a)(6) if a bankruptcy court finds that the nature of the underlying act (from which the punitive damages arose) involves willful and malicious conduct on the part of the debtor. *In re Britton,* 950 F.2d 602, 606 (9th Cir.1991); *In re Adams,* 761 F.2d 1422, 1427 (9th Cir.1985); *In re Florida,* 164 B.R. 636, 639–40 (9th Cir. BAP 1994).

However, Klause's actionable conduct is primarily based on fraud. And the Ninth Circuit has held that fraud-related punitive damages are *dischargeable* under § 523(a)(2)(A). *In re Levy,* 951 F.2d 196, 198 (9th Cir.1991). Because of the differing treatment of punitive damage awards under the two sections [§§ 523(a)(2) and 523(a)(6) ], creditors with punitive damages arising from fraud have a major incentive to assert that their claim meets the requirements of § 523(a)(6). The issue thus arises whether the Thompsons can, as a matter of law, assert nondischargeability of their punitive damage claim under § 523(a)(6) when § 523(a)(2)(A) specifically addresses the nondischargeability of debts relating to fraud. *See Grogan v. Garner,* 498 U.S. 279, 282 n. 2, 111 S.Ct. 654, 657 n. 2, 112 L.Ed.2d 755 (1991).

■ Whereas *In re Levy* determined that punitive damages could not be allowed under § 523(a)(2), it specifically found that fraud-related punitive damages may be *non-dischargeable* under other sections. The Ninth Circuit stated that although § 523(a)(2)(A) does not prevent discharge of punitive damages in fraud cases, where there is willful or malicious injury "the creditor should seek nondischargeability under § 523(a)(6). For punitive damages . . . the appropriate exception to discharge is § 523(a)(6) . . . ." *In re Levy,* 951 F.2d at 199. In short, *In re Levy's* holding is limited: the *dischargeability* of punitive damages under § 523(a)(2)(A) does not preclude *nondischargeability* of punitive damages under other sections of § 523, specifically § 523(a)(6).[4] *In re Levy,* 951 F.2d at 199; *see In re Daghighfekr,* 161 B.R. 685, 687 (9th Cir. BAP 1993).

damages, may recover damages for the sake of example and by way of punishing the defendant. . . .

. . . . .

(c) As used in this section, the following definitions shall apply:
(1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
(2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hard-

ship in conscious disregard of that person's rights.
(3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.
Cal.Civ.Code § 3294 (West Supp.1994).

**4.** This Court cannot conceive of a fact situation under § 523(a)(2) that would not also support a judgment under § 523(a)(6).

In further support, the Court observes there is no statutory prohibition under § 523 that requires a creditor to invoke only one of the various exceptions to discharge. *See* 11 U.S.C. § 523; *In re Dorsey,* 162 B.R. 150 (Bankr.N.D. Ill.1993). Section 523(a)(6) itself excepts from discharge those debts for "willful and malicious" injuries "by the debtor to another entity or to the property of another entity." Other than describing who the debtor injures ("another entity") or what the debtor injures ("the property of another entity"), there is no express limitation that § 523(a)(6) applies to claims unrelated to fraud.

The ultimate issue here is whether the fraudulent conduct that was the basis for the instant award of punitive damages was willful and malicious. If it was, then the punitive damages are nondischargeable under § 523(a)(6). If it was not, then they are dischargeable. The court has previously found that the fraudulent conduct was willful and malicious. Therefore the punitive damages in this case are not dischargeable in this bankruptcy.

### How are Punitive Damages Measured?

■■■■ In determining the amount of punitive damages that should be awarded, the trier of fact must look at three factors: the level of reprehensibility of the act, the amount of the compensatory damages awarded and the wealth of the particular defendant. *Neal v. Farmers Ins. Exchange,* 21 Cal.3d 910, 928, 148 Cal.Rptr. 389, 582 P.2d 980 (1978).

■■■■ The purpose of punitive damages is a public one—to punish wrongdoing and thereby protect society from future misconduct by this defendant or others. The amount of punitive damages must serve this societal interest. *Adams v. Murakami,* 54 Cal.3d 105, 110, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991). The amount of the award therefor should be greater if the act is more reprehensible. It should have some relationship to the amount of the compensatory damages. It should have some relationship to the amount of the compensatory damages. It should take into consideration the financial status of the defendant so that the debtor cannot absorb the award with little or no discomfort, but also so that the defendant is not financially destroyed. *Adams v. Murakami,* at 110, 112, 284 Cal.Rptr. 318, 813 P.2d 1348.

■ *Devlin v. Kearny Mesa AMC/Jeep/Renault,* 155 Cal.App.3d 381, 202 Cal.Rptr. 204 (1984) includes a survey of 16 California appellate decisions dealing with punitive damages. The Court then found that no formula exists in determining the amount of punitive damages to award. Instead, it is a fluid process. Net worth is an important factor, but other asset and income figures are relevant on the amount of punitive damages. *Id.* at 391, 202 Cal.Rptr. 204.

No one has dealt directly with the issue of a defendant who is in bankruptcy and therefor has a low net worth but good future earning potential. Of the 16 cases surveyed by *Devlin,* 13 are corporations (7 of which are insurance companies) and only 3 are individuals. It seems to this Court that in the case of a young, educated person, the Court should take into consideration past earnings, past and current assets, and future potential.

The evidence before this court is that Klause is 32 years old and has earned between $200,000 and $300,000 per year (based on partial financial statements for 1990 and 1992 supplied to the court by Klause). However he testified that he will be attending a seminary for the next two years and that his future earnings will be greatly reduced.

The issue of future earning potential of someone who changes his occupation has been dealt with in certain family law cases when determining the amount of spousal or child support awarded. Ohio courts have held that earning ability involves "both the amount of money one is capable of earning by his or her qualifications, as well as his or her ability to obtain such employment." *Haninger v. Haninger,* 8 Ohio App.3d 286, 288, 8 OBR 380, 456 N.E.2d 1228 (1982). When considering the relative earning abilities of the parties in connection with an award of spousal support, Ohio courts do not restrict their inquiry to the amount of money actually earned, but may also hold a person

accountable for the amount of money a person *could have earned if he made the effort. Id.* [Emphasis added.]

Because R.C. 3105.18(C) permits inquiry into a party's earning potential, Ohio courts often impute income to parties who are voluntarily underemployed or otherwise not working up to their full earning potential. *See, e.g., Frost v. Frost,* 84 Ohio App.3d 699, 618 N.E.2d 198 (1992); *See also, Haninger,* 8 Ohio App.3d 286, 456 N.E.2d 1228. Accordingly, even if it is determined that a party has no income, a court can impute income based on the party's earning ability. *Haninger* at 288, 456 N.E.2d 1228.[5]

Furthermore, future earning potential is also calculated when determining child support awards. In computing child support in accordance with the provision of R.C. 3113.21, a trial court must determine the annual income of each of the child's parents. Income for child-support purposes is defined in R.C. 3113.215(A)(1) as: "either of the following:

(a) For a parent who is employed to full capacity, the gross income of the parent;

(b) For a parent who is unemployed or *under employed,* the sum of the gross income of the parent, and any *potential income* of the parent." [Emphasis added.]

Klause claims he should be excused from paying any punitive damages because he is enrolling in Fuller Theological Seminary and therefore will not earn the same amount of income as in the past. Under the theory of the previous case law, Klause can be liable for his future earning potential regardless of whether he chooses to make the effort to earn it.

While these Ohio cases and statutes are instructive, they are not controlling, for in family law, the purpose for damages is different. The purpose for punitive damages is to punish the wrongdoer, while the purpose of awarding damages in family law

cases is to support the spouse or child. With family law cases, the courts are more willing to find a higher earning potential because the money goes to individuals who need it in order to survive. However, punitive damages are awarded to punish the individual for his or her acts.

In addition, exemplary damages are awarded to serve as an example or warning to others not to engage in such conduct (Cal.Civ.Code § 3294). The object of exemplary damages is to make the example as well as to have the punishment fit the offense. *Wetherbee v. United Ins. Co.,* 18 Cal. App.3d 266, 270–71, 95 Cal.Rptr. 678, 680 (1971) (citing to *Thomson v. Catalina,* 205 Cal. 402, 405–06, 271 P. 198, 62 A.L.R. 235 (1928)).

Nevertheless, the same analysis for calculating future earning potential in family law cases can also be used for calculating punitive damages. Although the purpose for each type of damages is different, there are still important policy issues for punitive damages, as well. Mr. Klause and others can be deterred from engaging in similar wrongful acts in the future. In addition, it would be too easy for a defendant to be excused from paying damages by merely changing his or her occupation. Individuals who do not want to pay damages can escape doing so by filing bankruptcy and changing occupations so they are underemployed whereby their future earning potential is dramatically reduced.

This issue can also be analogized to the dischargeability of student loans. The burden of proving a debtor is entitled to a discharge on the basis of undue hardship rests on the debtor. *In re Childs,* 89 B.R. 819, 819–20 (Bankr.D.Neb.1988) (citing to *In re Price,* 25 B.R. 256 (Bankr.W.D.Mo.1982); *In re Erickson,* 52 B.R. 154 (Bankr.D.N.D. 1985)). "The debtor must prove more than mere financial hardship or present financial adversity, she must show something akin to a certainty that future payments on the debts cannot be made." *Price* at 258. In *Childs*

---

5. An individual who does not choose to seek employment should not be precluded from alimony (or an increase in alimony) for that reason alone. *Haninger* at 288, 456 N.E.2d 1228. Rather, his or her earning ability remains the same whether or not employment is sought and must be considered in that light. *Id.*

the debtor was well educated and was qualified to practice law. The court was not convinced that the debtor's position was hopeless or that his financial hardship would extend into the foreseeable future. *Childs* at 820.

"[T]he dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment ... [T]he mere fact that a debtor is presently underemployed in a marginal job outside his chosen field does not mean he will never be able to obtain the type of employment which will permit repayment of student loans." *Erickson* at 158 (citing to *In re Briscoe*, 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981).

Analogizing these student loan cases to Klause's situation, Klause is definitely not in a "hopeless" position. Klause is only at the beginning of his productive years. Even if he attends the seminary, presumably he will continue to work and receive some amount of income. In addition, at any time, he can return to his old occupation. He has a Bachelor's Degree in Business, as well as a Master's Degree in Real Estate Development from U.S.C. He is definitely well educated and qualified in real estate management. He may be underemployed and training for less lucrative work, but that does not mean that he will not return to full employment in the not too distant future.

Nor is present wealth of the defendant a controlling issue in regards to the calculation of punitive damages and the wealth of the defendant. An Arizona appellate court determined that while the wealth of a defendant may be considered, it is but one of many factors. *Dodge City Motors v. Rogers*, 16 Ariz.App. 24, 490 P.2d 853 (1971). The court in *Puz v. McDonald*, 140 Ariz. 77, 79, 680 P.2d 213, 215 (Ct.App.1984), found "no authority, nor ... any precedent which would support appellant's contention that the sole fact that an award exceeds a defendant's present assets would be grounds for setting it aside." *See also Rinaldi v. Aaron*, 314 So.2d 762 (Fla.1975); *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1958).

In bankruptcy certain unique factors exist that make it particularly important to look to future earning potential. Unless this is a surplus estate, the debtor has already turned over all assets to his creditors (except for exempt property). To limit the review to current net worth would not provide the discomfort necessary to deter the defendant from future tortious and oppressive acts.

■ Thus, the court is free to look to earning potential, education, and earning history as well as current assets and employment in determining a proper amount for punitive damages. Indeed the circumstances call for a certain amount of creativity in the award of punitive damages.

The actions of Klause are reprehensible. He spent months developing his fraudulent scheme. He took advantage of retired people who will have a difficult time replacing their loss. He acted solely due to greed. Further, he still does not understand that he acted wrongly. Klause testified that he made decisions that he now regrets—not because of the harm that he caused, but because he perceives that they allowed him to become the victim of the attorney for the Thompsons (who Klause believes are persecuting him).

The award here exceeds $900,000. While the court would like to grant the same amount in punitive damages, that would be excessive given Klause's earning history. But it does not seem excessive to award punitive damages in the amount of one year of Klause's earning potential. After all, he spent one year in carrying out this scheme. Therefore the court awards punitive damages to Plaintiffs in the amount of $250,000.00. This amount is derived from the financial statements supplied to the court by Klause. During 1990 and 1992, Klause has shown to have the capacity to earn between $200,000 to $300,000 per year in income. It is reasonable that the amount of punitive damages should be the approximate value of one year of his earning potential.

However, Klause does not have the current assets to pay this amount and has chosen to pursue a different career. Therefore, it is reasonable and fair to deduct a percentage of Klause's yearly income to provide a payment

plan under which Klause would pay 10% each year of his gross income (after deducting taxes) for a 10 year period or until the $250,-000 is paid (whichever comes first).

Klause must provide financial data on April 15 each year for the prior year showing income and taxes. Then he must pay 10% of the difference until $250,000 is completely paid or until 10 years have expired, whichever is sooner. If Klause fails to provide the evidence in a timely fashion, the payment plan is terminated and the Thompsons can collect $250,000 (less any amounts received) immediately from Klause. The burden is on Klause to show financial hardship and prove his yearly income.

### ATTORNEYS' FEES

 A bankruptcy court has authority to apply either state or federal substantive law; the choice depends on the nature of the action involved. If state law governs the substantive issues involved in a motion or action, the bankruptcy court is also required to look to state law to determine whether attorney's fees are awarded. *In re Johnson,* 756 F.2d 738, 740–41 (9th Cir.1985). However, if federal law governs the substantive issues involved, the bankruptcy court is required to apply the American Rule, unless a federal statute provides for an allowance of attorney's fees or there is bad faith. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 269–71, 95 S.Ct. 1612, 1616, 1627–28, 44 L.Ed.2d 141 (1975); *In re Johnson,* 756 F.2d at 741.

 Concerned with relief from stay litigation, *Johnson* held that in such matters the issues are generally limited to equity, lack of adequate protection, and the necessity of the property for an effective reorganization. The validity of the claim or contract is not litigated; the motion is not the assertion of a claim that would give rise to the right or obligation to assert a counterclaim. Thus, state law is not considered in relief from stay litigation *vis-a-vis* attorney's fees issues.[6] *In re Johnson,* 756 F.2d at 740.

The Ninth Circuit has struggled with the issue of awarding attorneys' fees in dischargeability actions. Klause's counsel argues that *Grove v. Fulwiler,* 624 F.2d 908 (9th Cir.1980) is the controlling case and confirms their position that the Thompsons are not entitled to any recovery of attorney's fees. Decided in 1980, under Section 17 of the Bankruptcy Act, *Fulwiler* held that dischargeability actions are purely federal causes of action and that a *debtor-defendant* who prevails in the dischargeability action is not entitled to its attorney's fees under a state statute that provides for fees to the prevailing party on a contract cause of action. In terms of the relationship of a state judgment and a judgment that the claim is not discharged by the bankruptcy, *Fulwiler* extends *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), beyond its holding when it states "... a prior state court judgment or a collection action by a creditor against a bankrupt could have no res judicata effect on a subsequent dischargeability proceeding because the two actions were likely to be entirely different."[7] *Fulwiler* at 909.

Klause also presents the Bankruptcy Appellate Panel decision of *Itule v. Metlease,* 114 B.R. 206 (9th Cir. BAP 1990), which adopted the *Fulwiler* holding that attorney's fees incurred while bringing a dischargeability action are dischargeable. First, *Itule* held that a prevailing creditor is not prohibited

---

6. The Johnson decision dealt with a request for attorney's fees based on California Civil Code § 1717. However if the fee application had been under 11 U.S.C. 506(b), the creditor was oversecured, and the loan agreement provided for attorney's fees, attorney's fees would be allowed to a prevailing creditor on a relief from stay motion. *In re Salazar,* 82 B.R. 538 (9th Cir. BAP 1987). In this case there is no collateral for the loan, so § 506(b) does not apply.

7. *Brown v. Felsen* involved a debtor using the concept of res judicata as a shield in that the creditor had received a state court judgment for breach of contract and then sought to have the same debt declared non-dischargeable as fraud when the debtor filed bankruptcy. Some years after *Fulwiler,* the Supreme Court in *Grogan,* 498 U.S. at 284, 111 S.Ct. at 658, held that if the creditor obtained a state court judgment, the bankruptcy court can give "collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and which were actually litigated and determined in the prior action."

from an award of attorney's fees because they are not mentioned in § 523(d). However, it did not find any authorization in the Bankruptcy Code for awarding attorney's fees to the creditor. *Itule* cited to dicta in *In re Levinson*, 58 B.R. 831, 837–38 n. 7 (Bankr. N.D.Ill.1986). There Judge Ginsberg commented that the pre-petition state court attorney's fees are nondischargeable, but the post-petition attorney's fees incurred by the plaintiff, while litigating a dischargeability complaint, are dischargeable. He based this on the overwhelming weight of authority as it existed in 1986 and not on any specific portion of the code.

However *Itule*, which was decided on May 31, 1990, preceded *In re Ashley*, 903 F.2d 599 (9th Cir.1990), which the Ninth Circuit decided on June 11, 1990. *Ashley* contains a similar procedural posture to *Klause v. Thompson* in that the dischargeability trial was conducted solely in the bankruptcy court, with no prior adjudication by the state court. The bankruptcy court awarded the prevailing creditor attorney's fees under California's *Prentiss* exception to the American rule, which allows recovery of attorney's fees if the action is against a third party. The Ninth Circuit determined that the *Prentiss* exception did not apply to these facts and therefore reversed the award. But the Court of Appeals stated that "[i]t was permissible for the bankruptcy court to resort to state law to decide whether to award attorney's fees because state law governed the underlying claim in bankruptcy." *In re Ashley*, 903 F.2d 599, 605 n. 7 (9th Cir.1990).

Since 1991, the Ninth Circuit has continued to deal with the issue of when attorney's fees can be awarded to the prevailing party in bankruptcy litigation, although not specifically in dischargeability matters. The debtor cites *In re Fobian*, 951 F.2d 1149 (9th Cir. 1991) which held that in chapter 12 a secured creditor, who prevailed on objection to the plan, was not entitled to attorney's fees because the litigated issues are peculiar to bankruptcy law and are not a traditional action on a contract. In *Fobian* the court held that the litigation solely involved applying § 506 and § 1225 of the bankruptcy code and therefore state law did not apply.

The most recent Ninth Circuit BAP opinion, *In re Gee*, 173 B.R. 189 (9th Cir. BAP 1994), held that where the bankruptcy court did not apply state law in deciding issues of liability and damages, attorney's fees should not be awarded.[8] That case was brought solely under § 523(a)(6), for which there is no direct state law equivalent. However the *Klause* case also involves a judgment for fraud under § 523(a)(2). By deciding the rescission, fraud and damages issues against Klause under California state law, this Court avoids the problem posed in *Gee*.

■ Reviewing the reported cases, the most common process for determining the dischargeability of a debt is to have the matter fully litigated in state court and then to subject that award to the scrutiny of the bankruptcy court through use of collateral estoppel. Basically the bankruptcy court determines whether the trier of fact in the underlying action made findings on each of the elements required under § 523(a). If the underlying judgment includes attorney's fees based on state law, these are allowed to survive the discharge. *Dutton v. Schwartz*, 21 B.R. 1014 (Bankr.D.Mont.1982).

However Klause filed bankruptcy before the state complaint could be completely litigated. Then this adversary was filed by him and the bankruptcy court became the trier of fact on the entire action.

The vast majority of opinion holds that attorney's fees awarded in a state court fraud litigation will not be discharged if the bankruptcy court holds the debtor liable under § 523(a)(2). But the debate continues among the bankruptcy courts as to the dischargeability of fees incurred in the § 523(a)(2) action if there was no state court judgment for fraud. Some courts see dischargeability as a purely federal action and therefore no fees may be awarded unless there is a federal statute which allows them.[9] However other courts look to the nature of the litigation

---

8. *Gee* cites *Itule* and *Fobian*, but fails to mention *Ashley*.

9. *See e.g., In re Bonnifield*, 154 B.R. 743 (Bankr. N.D.Cal.1993).

and whether it could have occurred in state court.[10]

This judge believes that to rule that the debtor need not pay attorney's fees on the basic fraud action because he forced the litigation into the bankruptcy court before it could take place in a state forum is to reward someone who has been found by this court to be a defrauder. To follow the bright line test urged by the debtor would create a tremendous incentive for defendants in fraud cases to forum shop. The defendant could reduce the ultimate judgment by thousands or tens of thousands of dollars by filing bankruptcy before the plaintiff has time to litigate the fraud claim. It would become malpractice for a defense attorney to let a fraud case go to trial in state court if the attorney believes that the defendant might lose.

Our alternative would be to abstain from all § 523(a)(2) cases or, at least, to suspend proceedings and make the parties litigate them in state court.[11] This cannot be the scheme envisioned in all the rhetoric about the exclusive right of the bankruptcy court to determine dischargeability of debts.[12]

The only thing which makes sense to this court is that if the trial is held in the bankruptcy court, the fees must be bifurcated so that the prevailing creditor is awarded attorney's fees for the fraud litigation as though it had taken place in state court, but is not given attorney's fees for the work done on determining issues that arise under bankruptcy law. This theory follows the policy

enunciated in *In re Jordan,* 927 F.2d 221, 227–28 (5th Cir.1991), where the court stated that

... [A] contrary rule sanctioning the discharge of attorney's fees on a contractual debt otherwise nondischargeable would leave dishonest debtors better off under the Code than under state law without furthering a bankruptcy policy. Accordingly, such a rule would violate the Code's underlying principle that, unless a bankruptcy reason demands it, debtors and creditors should not be treated one way under state law and another way under federal bankruptcy law. Furthermore, it would impede the Code's purpose of discharging only the honest debtor from his debts.[13]

If this Court follows the reasoning in *Bonnifield,* it would be too easy for the debtor to escape paying attorney's fees by filing bankruptcy before the state court action is decided. Moreover, it would be unfair to allow the dishonest debtor to require the plaintiff to bear his own attorney's fees for proving fraud [14] by timing the filing of the bankruptcy so that the whole action is tried in bankruptcy court.

Therefore the Court will first determine whether the Thompsons are entitled to attorney's fees under California law. Then, if the Court can separate the fees for work on the rescission/fraud/damages part of the case from those on the § 523 portion, only those

10. *See, e.g., In re Silva,* 125 B.R. 28 (Bankr. C.D.Cal.1991).

11. The bankruptcy court is considered by many to be the commercial court of the nation. To open our doors to so many fraud cases would make us the intentional tort forum of the nation.

12. Before 1970, the state and bankruptcy courts had concurrent jurisdiction when deciding whether debts were dischargeable. *Brown v. Felsen,* stated that traditionally, the bankruptcy courts left the issue of dischargeability under § 17 to the court in which the creditor sued. This was typically state court. 442 U.S. 127, 129, 99 S.Ct. 2205, 2208, 60 L.Ed.2d 767 (1979). However, the 1970 amendments gave bankruptcy courts exclusive jurisdiction over §§ 17(a)(2) and (6) claims, now §§ 523(a)(2) and (6) respectively. *Brown,* 442 U.S. at 135–36, 99 S.Ct. at 2211–12;

*See also Grogan v. Garner,* 498 U.S. 279, 288 n. 10, 111 S.Ct. 654, 660 n. 10, 112 L.Ed.2d 755 (1991); S.Rep. No. 91–1173, pp. 2–3 (1970); H.R.Rep. No. 91–1502, p. 1 (1970).

13. In *Jordan* there was no prior trial in state court on the fraud claim for relief. The Fifth Circuit found that § 523(a)(2)(B) excepted from discharge the entire debt incurred through fraud and that includes attorney's fees if they are awardable as a matter of state law.

14. This opinion limits the recovery of attorney's fees to a claim for relief which has an equivalent cause of action under state law. As noted in the discussion on punitive damages, the court cannot envision a fraud action that does not also fit under § 523(a)(6). However theoretically there are actions under § 523(a)(6) for which no attorney's fees would be allowed (nor even damages given) under state law.

fees that would have been expended in state court (had this matter gone to conclusion) will be granted to the Thompsons.

To determine whether attorney's fees are awarded under California law, the Court must look to the real estate purchase and sale agreement between Klause and the Thompsons.[15] If the agreement provides for an award of attorney's fees, then the Court may rule pursuant to either Cal.Civ.Code § 1717 or Cal.Civ.Proc.Code § 1021. The Court can quickly dispose of an award based on § 1717, since the claim and counterclaim in the instant case do not involve a contract cause of action. In the alternative, application of § 1021 arises if there is an "expressed or implied" agreement between the parties with respect to attorney's fees.

If there is a provision for attorney's fees in the purchase agreement between the parties, this Court must look to the language of the agreement to determine whether the parties contemplated compensation for an action not sounding in contract. *In re 3250 Wilshire Blvd. Bldg.*, 990 F.2d 487 (9th Cir.1993); *Lerner v. Ward*, 13 Cal.App.4th 155, 16 Cal. Rptr.2d 486 (1993).[16]

The operative language in the Purchase Agreement and Deposit Receipt [Ex. 8, ¶ 21(c) ] is as follows: "If a lawsuit or other proceeding is instituted to enforce the rights under this Agreement, including by the agent, the prevailing party shall be entitled to recover court costs and reasonable attorney's fees. If the action is to enforce the commission, it is agreed that reasonable attorney's fees shall be at least 40% of the amount recovered by the agent."

A somewhat similar provision existed in the Purchase Agreement in *Xuereb v. Marcus & Millichap, Inc.*, 3 Cal.App.4th 1338, 1340, 5 Cal.Rptr.2d 154 (1992), *rev. denied*, (1992): "If this agreement gives rise to a lawsuit or other legal proceeding between any of the parties hereto, including Agent,

the prevailing party shall be entitled to recover actual court costs and reasonable attorneys' fees in addition to any other relief to which such party may be entitled." The Court held that the tort causes of action arose from the purchase agreement and awarded attorney's fees to the prevailing party on the tort claims of delivering the building in a defective condition.

In *3250 Wilshire Boulevard Building v. W.R. Grace & Co.*, 990 F.2d 487 (9th Cir. 1993), the Court awarded the prevailing party attorney's fees for a tort claim based on the following language in the Purchase and Sale Agreement: "In the event either Buyer or Seller brings any suit or other proceeding with respect to the subject matter or enforcement of this Agreement, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced) shall, in addition to such other relief as may be awarded, be entitled to recover attorney's fees, expenses and costs of an investigation as actually occurred...." *Id.* at 489. Wilshire argued that this provision was limited to suits to enforce the purchase agreement. However the Ninth Circuit ruled that the language "with respect to the subject matter ... of this Agreement" was broad enough to cover tort actions on the sale, because the sale of the building was the agreement's subject matter.

*Lerner v. Ward*, 13 Cal.App.4th 155, 158–9, 16 Cal.Rptr.2d 486 (1993), interpreted the language of a purchase agreement which awarded attorneys' fees to the prevailing party "[i]n any action or proceeding arising out of this agreement...." The Court held that this "clause was not limited merely to an action on a contract, but to any action or proceeding arising out of the agreement. This included any action for fraud arising out of that agreement." *Id.* at 160, 16 Cal. Rptr.2d 486.

---

15. Both parties have accepted the Purchase Agreement [ex. 8] as the operating agreement in that Klause demanded arbitration of the civil action in reliance on ¶ 20 of the Purchase Agreement and the Superior Court upheld this demand.

16. It should be noted that *Lerner* held that the prevailing party was entitled to recover attorney's fees as costs pursuant to the terms of the agreement under § 1021. Therefore the reasoning of *In re Levy, supra,* concerning additional damages in fraud actions does not preclude attorney's fees under § 523(a)(2), since these are costs and not damages.

However, the provision in exhibit 8 is more limited than those in the above cases. It specifies that fees will be awarded if the suit is instituted to *enforce the rights under the agreement.* It does not deal with any lawsuit that *the agreement gives rise to (Xuereb)* nor to the *subject matter of the agreement (3250 Wilshire )* nor to an action *arising out of the agreement.* Therefore the Court feels compelled to note whether any of the fraudulent or willful and malicious conduct occurred within the context of "the rights" given Thompson under the Purchase Agreement.

The Court need go no further than Paragraph 6 of the Purchase Agreement, which required Klause to provide a current rental statement and copies of all leases. The Thompsons had a right to receive true and correct documents, not fraudulent ones. Thus, had this case been tried in superior court on the basis of fraud, the Thompsons would be entitled to their attorney's fees for dealing with the fraudulent conduct of Klause in violation of their rights under the purchase agreement.

As noted above, that portion of the fees spent on the fraud claim for relief shall be part of this judgment and are nondischargeable; whereas any fees spent on the bankruptcy issues (be they under § 523 or otherwise) may not be awarded to the plaintiffs. There was only one trial, one set of discovery, and one set of issues. However there will be no award for the relatively small amount of additional work that was done on the federal issues, specifically for certain trial briefs on bankruptcy law. The declarations before this court show that the Thompsons are entitled to $310,200.84 in fees pursuant to § 523(a)(2) [17].

---

17. Weinberg & Weinberg charged $60,304.72 for proceeding with this case in state court and the arbitration; Tuttle & Taylor incurred $249,-896.12 in the dischargeability proceeding (exclusive of work done solely on bankruptcy issues). Further there was a claim for costs of reporter, expert, copying and arbitration. All of these appear to be reimbursable as costs pursuant to Local Rule 130. Plaintiffs are to submit their bill of costs for these items.